1  GLASER, WEIL, FINK, JACOBS,
   HOWARD & SHAPIRO, LLP
2  PATRICIA L. GLASER (SBN 055668)
   Email: pglaser@glaserweil.com
3  JILL BASINGER (SBN 195739)
   Email: jbasinger@glaserweil.com
4  10250 Constellation Boulevard, 19th Floor
5  Los Angeles, California 90067
   Telephone: (310) 553-3000
6  Facsimile: (310) 556-2920

7
   HARVEY SISKIND LLP
8  IAN K. BOYD (SBN 191434)
   Email: iboyd@harveysiskind.com
9  SETH I. APPEL (SBN 233421)
   Email: sappel@harveysiskind.com
10 Four Embarcadero Center, 39th Floor
   San Francisco, CA 94111
11 Telephone: (415) 354-0100
12 Facsimile: (415) 391-7124

13 Attorneys for Plaintiffs
   DR. MICHAEL WEINER, p/k/a MICHAEL SAVAGE
14 and SAVAGE PRODUCTIONS, INC.

15

16          **UNITED STATES DISTRICT COURT**

17         **NORTHERN DISTRICT OF CALIFORNIA**

18             **SAN FRANCISCO DIVISION**

19 | DR. MICHAEL A. WEINER p/k/a MICHAEL     Case No. CV10 5785
20 | SAVAGE,
   | an individual, and SAVAGE PRODUCTIONS,   **COMPLAINT FOR:**
21 | INC., a corporation

22 |                  Plaintiffs,             **1. DECLARATORY RELIEF RE NO
                                              MATCH**
23 |        v.                                **2. DECLARATORY RELIEF RE
                                              INDEFINITE PROVISION**
   | THE ORIGINAL TALK RADIO NETWORK,         **3. DECLARATORY RELIEF RE
24 | INC. d/b/a TALK RADIO NETWORK, INC., a    MATCHING PROVISION AGAINST
25 | corporation,                             PUBLIC POLICY**
                                              **4. DECLARATORY RELIEF RE
26 |                  Defendant.              UNENFORCEABILITY OF
                                              ARBITRATION PROVISION**
27

28

                          COMPLAINT

1         Plaintiffs Dr. Michael A. Weiner, p/k/a Michael Savage ("Dr. Savage") and Savage

2 Productions, Inc. ("SPI") (collectively, "Plaintiffs") for their Complaint against defendant The

3 Original Talk Radio Network, Inc. d/b/a Talk Radio Network, Inc. ("TRN") allege as follows:

## NATURE OF THE ACTION

5       1.     Through the use of illegal and unenforceable contract provisions, threats of false

6 claims alleging several million dollars, and other strong arm tactics designed to intimidate Dr.

7 Savage, TRN is attempting to force Dr. Savage into accepting a sub-standard agreement containing

8 what can only be described as an indentured servitude provision.

9       Dr. Savage is the nationally known talk-show host and star of "The Michael Savage Show"

10 ("Show"). He was recently profiled in *The New Yorker* as a "fiercely independent artist." The Show

11 reaches approximately eight million listeners per week, according to *Talkers Magazine*. TRN

12 currently syndicates the Show. Dr. Savage's agreement with TRN expires in December 2010. Over

13 the past two months, at TRN's encouragement, Dr. Savage sought out proposals from different

14 syndicators for next year and beyond. The most favorable proposal was not from TRN, but from

15 Courtside, LLC (which is headed by Norman Pattiz, the founder of radio industry giant Westwood

16 One). Courtside has offered to syndicate the Show through Westwood One by offering a deal

17 containing terms and resulting benefits which have no equivalent through the TRN syndication

18 system. TRN purports to have exercised its right to match, pursuant to the parties' agreement, but the

19 agreement it proposed to Dr. Savage does not match the terms of the Courtside proposal. Not only

20 does the TRN proposal not match the Courtside proposal in terms of financial upside, but it includes

21 anti–competitive provisions that are illegal, limits Dr. Savage's valuable negotiating rights, and

22 imposes additional terms that are not contained in the Courtside proposal. Moreover, Dr. Savage's

23 current agreement with TRN contains provisions that are illegal and unenforceable. TRN is currently

24 attempting to use those provisions to force Dr. Savage to sign an agreement he is not interested in,

25 and to force him into an arbitration that wholly ignores his due process rights. Accordingly, Plaintiffs

26 require prompt declaratory relief or face the significant risk of losing the Courtside opportunity,

27 which is valued at several million dollars, and being forced to submit to an illegal arbitration. This

28 action seeks the following declarations from the Court: 1) that TRN has failed to match the Courtside

-1-

1   proposal; 2) that the "matching provision" in the current TRN/Savage agreement has an indefinite

2   term and is therefore unenforceable; 3) that the "matching provision" in the current TRN/Savage

3   agreement is unenforceable as against public policy; and 4) that the "arbitration provision" in the

4   current TRN/Savage agreement is illegal and unenforceable

5   **JURISDICTION**

6      2.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1332 and 2201 because

7   this case involves an actual controversy, namely Plaintiffs' ability to contract with Courtside, LLC,

8   which is valued far in excess of $75,000.  There is complete diversity in citizenship between the

9   parties.

10   **DISTRICT AND INTRADISTRICT VENUE**

11      3.     Venue is proper in the Northern District of California under 28 USC 1391(b) because

12   a substantial part of the events or omissions giving rise to the claim occurred here, or a substantial

13   part of the property that is the subject of this action is situated in this judicial district.  Intradistrict

14   venue is proper in the San Francisco Division of this judicial district under Local Rule 3-2(d) because

15   the action arises in Marin County, California.

16   **THE PARTIES**

17      4.     Plaintiff Dr. Michael A. Weiner, p/k/a Michael Savage ("Dr. Savage") is an individual

18   residing in Marin County, California.

19      5.     Plaintiff Savage Productions, Inc. ("SPI) is a California corporation with its principal

20   place of business in Marin County, California.

21      6.     Defendant The Original Talk Radio Network, Inc. d/b/a Talk Radio Network, Inc.

22   ("TRN") is an Oregon corporation with its principal place of business in Grants Pass, Oregon.  The

23   CEO of TRN is Mark Master ("Masters").  Masters conducts negotiations with Dr. Savage on TRN's

24   behalf.

25   **FACTS**

26   **The Terms of the Agreement**

27      7.     In 1999, the parties entered into a written agreement whereby TRN agreed to

28   syndicate Dr. Savage's radio talk show for a term initially specified to commence on December 1,

1999, but actually commencing on January 17, 2000 ("Initial Agreement").  Prior to the expiration of the Initial Agreement, the parties extended the relationship via an option agreement between TRN and Dr. Savage ("Option Agreement") through November 30, 2004.  Prior to the expiration of the Option Agreement, in December 2002, the parties extended the relationship via a host agreement, which was set to expire on March 31, 2008 ("Agreement").  A true and correct copy of the relevant portions of the Agreement is attached hereto as Exhibit A.

8.      The parties extended the Agreement via two subsequent amendments.   The first addendum, signed on January 25, 2008, extended the Agreement to December 31, 2008 ("First Addendum").  The second addendum, signed on November 20, 2008, extended the Agreement until December 31, 2010 ("Second Addendum").   The parties have continuously been in contract from January 2000 through December 2010.

9.      Paragraph 19 of the Agreement is entitled "Right to Match" and states as follows:

> Through the date which is one year after [December 31, 2010], [TRN] shall have the right to match the terms of any contract [Dr. Savage] is prepared to enter into for [Dr. Savage's] future services in the radio broadcast industry . . . .  As such, through the first anniversary of [December 31, 2010], before entering into any contract or agreement of any kind for [Dr. Savage's] services in the radio broadcast industry following the New Expiration Date, [Dr. Savage] shall give to [TRN] a written notice of [Dr. Savage's] intent to contract, containing the principal terms of the intended contract (together with a copy of the term sheet which reflects the offer [Dr. Savage] has been presented).   [TRN] shall then have the right to accept, by written notice issued to [Dr. Savage] within ten (10) working days of [TRN's] receipt of [Dr. Savage's] notice, such contract terms, and, in so doing, establish a new contract between [Dr. Savage] and [TRN] on such terms and conditions.

(Exhibit A, page 17, ¶19).

10.      By virtue of this "Right to Match" section, the Agreement contains no definite term.  TRN is able to continually renew the Agreement for Dr. Savage's services, and has done so to date.  Moreover, TRN can perpetually renew Dr. Savage's employment ad infinitum, thus completely restricting Dr. Savage's ability to move as an employee, restraining his pursuit of his trade and, thus, operates as a thinly-veiled non-compete agreement by forever preventing Dr. Savage from syndication (i.e. distribution) of his show by any radio syndicator other than TRN.

11.     The Agreement also contains an arbitration provision (the "Arbitration Provision"), which contains numerous unfair, one-sided and unconstitutional provisions.   For example, the Arbitration Provision requires, among other things, that:

      a.     the parties may not be represented by lawyers at the arbitration, but by themselves only;

      b.     the arbitrator cannot be a lawyer;

      c.     TRN's witnesses (but not Plaintiffs') may testify by telephone at the arbitration; and

      d.     the Agreement cannot be terminated in any forum, including but not limited to, arbitration, under any circumstances (i.e. a restricted number of remedies unequal to those available in litigation). (Exh. A p.12-13, ¶8.)

12.     In addition, what is even more egregious than what the Arbitration Provision provides, as listed above, is what the Arbitration Provision fails to provide.   For example, the Arbitration Provision fails to provide, among other things:

      a.     any reference to JAMS, AAA or any other arbitration rules;

      b.     any time frame for the arbitration;

      c.     any provision for discovery;

      d.     any right to present testimony and/or cross-examine witnesses;

      e.     any protections for due process rights;

      f.     any rules of evidence;

      g.     any right to present documentary evidence; and

      h.     any requirement that the arbitrator provide a "concise" written statement of reasons with essential findings and conclusions. (Exh. A, 12-13, ¶ 8.)

13.     Even if the Arbitration Provision did include such provisions, they would be rendered meaningless as Dr. Savage, a 68 year-old non-lawyer, would have to represent himself at the arbitration.   Moreover, the arbitrator herself would likewise be a non-lawyer unable to oversee properly the arbitration and provide the necessary legal protections and rulings.

**The Courtside Offer**

14. In July 2010, Masters, TRN's CEO, wrote to Dr. Savage and "strongly advise[d]" that Dr. Savage test the market to confirm that he would not find a better deal for 2011 and beyond with anyone other than TRN.

15. In September 2010, TRN's counsel similarly wrote to Dr. Savage's counsel and advised that TRN was aware that Dr. Savage's contract "will be up for renewal in the near future." To try to justify that its forthcoming renewal offer would be fair, TRN gave its "consent and support" to encourage Dr. Savage "to avail himself of an early opportunity to survey the broadcasting marketplace to determine the marketability and value of his inventory and to determine, through objective indicators, whether he might in fact be better off, economically and otherwise, in contracting for the syndication of his show through others." TRN's negotiation tactic backfired, as Dr. Savage had multiple suitors.

16. Accordingly, with TRN's encouragement, Dr. Savage and his representatives discussed potential syndications deals with third parties in the radio syndication industry. At the same time, due to the rapidly approaching expiration date of the Agreement, the parties began negotiating a third amendment to extend the Agreement past 2010 ("Draft Third Amendment"). However, the parties never finalized nor executed the Draft Third Amendment.

17. After discussing syndication proposals with various third parties, Dr. Savage selected an offer from Courtside LLC for syndication of his show through Norman Pattiz (the founder of Westwood One) and the Westwood One radio network for 2011 and 2012. The Courtside offer was reflected in a term sheet of principal terms ("Courtside Term Sheet"). A true and correct copy of the Courtside Term Sheet is attached hereto as Exhibit B.

18. To Dr. Savage, the Courtside proposal was the most desirable offer received, because, among other reasons: 1) His show would receive greater publicity than it had through TRN because Courtside would promote Dr. Savage through Westwood One's inventory including, but not limited to such broadcasts of NFL football, NCAA Basketball, Metro Traffic, CNN News, NBC News, CBS News, Westwood One Talk Radio, and others; 2) Dr. Savage's compensation would be based on 50% of Courtside's Adjusted Gross receipts, which receipts would be substantial given the exposure Dr.

1  Savage would receive through Westwood One; 3) Dr. Savage would receive a 1% equity stake in

2  RightNetwork, a company with over 1,000,000 monthly visitors to its website which is currently

3  available on Verizon's FIOS network serving almost 4.5 million homes; 4) the Courtside offer did

4  not contain a "right to match" clause enforceable up to 12 months after the expiration of the

5  agreement; 5) the Courtside offer did not contain an arbitration provision which forced Dr. Savage to

6  give up his right to counsel and his right to due process; and 6) the Courtside offer included a

7  provision that Norman Pattiz would oversee all aspects of the show.  Mr. Pattiz is a well regarded

8  radio industry titan, who, in addition to founding Westwood One, a) is a member of the University of

9  California Board of Regents, b) is a member of the National Radio Hall of Fame, c) received the

10  Giants of Broadcasting award in 2009, d) helped found and run Alhurra, the first U.S.-based and

11  government-sponsored Arabic-language satellite T.V. channel broadcasting across the Middle East

12  and, e) was appointed by President Bill Clinton and President George W. Bush to the United States

13  of America Broadcasting Board.  Due to his vast experience and success in the radio industry, and his

14  ongoing activities, Mr. Pattiz has the ability to facilitate the placement of prominent guests on Dr.

15  Savage's show from such fields as politics and science in a manner which has no equivalent.

16  **TRN'S CLAIMS OF MATCHING THE COURTSIDE AGREEMENT**

17      19.    On November 17, 2010, pursuant to Paragraph 19 of the Agreement, Plaintiffs

18  tendered the Courtside Term Sheet to TRN, along with their intention to contract with Courtside.

19      20.    After threatening correspondence sent by Mark Masters to Dr. Savage, on November

20  30, 2010, TRN's counsel wrote that TRN "hereby exercises its right to match" the Courtside Term

21  Sheet.  On Friday, December 3, TRN presented Plaintiffs with a proposed agreement.  On Sunday,

22  December 5, Plaintiffs' counsel notified TRN's counsel in writing that TRN had failed to match the

23  Courtside offer.  On Monday December 6, Plaintiffs' counsel again wrote to TRN repeating that TRN

24  failed to match.

25      21.    On Tuesday, December 7, TRN's counsel contacted Plaintiff's counsel and stated that

26  TRN would immediately sue Dr. Savage unless he confirmed by the end of the day that TRN had

27  timely notified Dr. Savage of its intention to match under the Agreement.  TRN's counsel further

28  stated that unless Dr. Savage agreed to the Draft Third Amendment with TRN, instead of forcing

TRN to match the Courtside Term Sheet (which was far more favorable to Dr. Savage), TRN would immediately sue Dr. Savage for its claimed losses in excess of $3,000,000. In other words, if Dr. Savage required TRN to abide by the terms of its own Agreement and match the Courtside Term Sheet, TRN would sue Dr. Savage for more than $3,000,000 and assert its false claims. Dr. Savage accordingly acknowledged that TRN timely notified him of its intent to match, but maintains the position that TRN has in fact failed to match.

22. On Wednesday, December 15, TRN provided Plaintiffs with yet another draft agreement ("Second Draft Agreement") which still failed to match the Courtside Term Sheet on multiple fronts. Attached hereto as Exhibit C are the TRN terms that TRN claims match the Courtside offer.

23. The Second Draft Agreement did not match the Courtside offer in a number of significant ways, including but not limited to: 1) Dr. Savage's show would receive less publicity because it would not be promoted through Westwood One, but through an inferior collection of unspecified affiliates, selected at TRN's sole discretion; 2) Dr. Savage's compensation would be based on 50% of Network's Adjusted Gross receipts, which Adjusted Gross receipts will be substantially less then Courtside's Adjusted Gross receipts given that TRN is using an inventory of shows, inferior to Westwood One's inventory of shows, to promote Dr. Savage; 3) Instead of receiving a 1% equity stake in RightNetwork, TRN is offering Dr. Savage a 1% stake in a yet unnamed and undefined "video program distributor"; 4) TRN continues to insist on its illegal and onerous 12 month "right to match" provision, a provision absent from the Courtside offer; 5) the Second Draft Agreement finally rejects the illegal arbitration provision in the Initial Agreement, but replaces it with a very onerous dispute resolution provision; and 6) instead of working with broadcasting legend Norman Pattiz, the TRN's Second Draft Agreement proposes that Dr. Savage work closely with Mark Masters, a man who repeatedly threatens and harasses Dr. Savage. Masters has attempted to enforce an illegal arbitration procedure against Dr. Savage on two occasions and as of this past week now claims damages against Dr. Savage in excess of 4 million dollars because Dr. Savage will not agree to a less favorable offer from TRN (TRN's false claims against Dr. Savage

1  have somehow increased in scope from $3,000,000 to $4,000,000 over just the last week, as further

2  evidence of TRN's bad-faith).

3       24.    Plaintiffs do not dispute that TRN timely notified Plaintiffs of its intention to match

4  under the Agreement.  However, TRN did not match.  Moreover, because the "matching provision"

5  is illegal and against public policy, TRN does not have the legal right to match.  Therefore, this

6  action seeks the following declarations from the Court: 1) that TRN has failed to match the

7  agreement proposed by Courtside; 2) that the "matching provision" in the current TRN/Savage

8  agreement has an indefinite term and is therefore unenforceable; 3) that the "matching provision" in

9  the current TRN/Savage agreement is unenforceable as against public policy; and 4) that the

10  "arbitration provision" in the current TRN/Savage agreement is illegal and unenforceable

## FIRST CAUSE OF ACTION FOR
## DECLARATORY RELIEF AGAINST TRN
### (That the TRN offer does not match the Courtside Offer)

14       25.    Plaintiffs reallege and incorporate by reference the allegations of Paragraphs 1 through

15  24.

16       26.    An actual controversy has arisen and now exists between Plaintiffs and TRN

17  concerning their respective rights and duties.  TRN contends that it has matched each and every term

18  of the Courtside Term Sheet.  Plaintiffs deny that TRN has matched each and every term of the

19  Courtside Term Sheet.  Additionally, TRN has added terms that are not on the Courtside Term Sheet

20  and that are detrimental to Dr. Savage's rights.

21       27.    Plaintiffs desire a judicial determination of their rights and duties, and a declaration

22  that TRN has not matched each and every term of the Courtside Term Sheet, and that the time to

23  match has now expired.

24       28.    A judicial declaration is necessary and appropriate at this time so that Plaintiffs may

25  ascertain their rights and duties as against TRN.

26  ///

27  ///

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### SECOND CAUSE OF ACTION FOR

### DECLARATORY RELIEF AGAINST TRN

**(Agreement is for an Indefinite Period of Time)**

29.     Plaintiffs reallege and incorporate by reference the allegations of Paragraphs 1 through 28.

30.     An actual controversy has arisen and now exists between Plaintiffs and TRN concerning their respective rights and duties.

31.     Plaintiffs contend that because the Right to Match provision can be exercised repeatedly, Dr. Savage is forced to be employed by TRN indefinitely

32.     Plaintiffs contend that the Agreement between Plaintiffs and TRN is a contract of employment for an indefinite period of time, and is, thus, voidable and terminable at will by either party.

33.     Plaintiffs desire a judicial determination of their rights and duties, and a declaration that the Agreement is a contract of employment for an indefinite period of time, and is, thus, voidable and terminable at will by either party.

34.     A judicial declaration is necessary and appropriate at this time so that Plaintiffs may ascertain their rights and duties as against TRN.

### THIRD CAUSE OF ACTION FOR

### DECLARATORY RELIEF AGAINST TRN

**(Agreement is Against Public Policy)**

35.     Plaintiffs reallege and incorporate by reference the allegations of Paragraphs 1 through 34.

36.     An actual controversy has arisen and now exists between Plaintiffs and TRN concerning their respective rights and duties.  Plaintiffs contend that the Agreement between Plaintiffs and TRN is unenforceable as against public policy in that it permits TRN to renew the Agreement *ad infinitum*, and, thus, unlawfully restricts Plaintiffs' movement as an employee, constitutes an unlawful restraint of trade, and is in actuality a thinly-veiled non-compete agreement.

37.   Plaintiffs desire a judicial determination of their rights and duties, and a declaration that the Agreement is unenforceable as against public policy.

38.   A judicial declaration is necessary and appropriate at this time so that Plaintiffs may ascertain their rights and duties as against TRN.

### FOURTH CAUSE OF ACTION FOR

### DECLARATORY RELIEF AGAINST TRN

#### (Unenforceability of Arbitration Provision)

39.   Plaintiffs reallege and incorporate by reference the allegations of Paragraphs 1 through 38.

40.   An actual controversy has arisen and now exists between Plaintiffs and TRN concerning their respective rights and duties.  Plaintiffs contend that the arbitration provision in the Agreement between Plaintiffs and TRN is unenforceable as it violates Plaintiffs' constitutional due process rights by, *inter alia*, preventing Plaintiffs from representation by counsel in any arbitration between the parties.

41.   Plaintiffs desire a judicial determination of their rights and duties, and a declaration that the arbitration provision in the Agreement is unenforceable as it violates Plaintiffs' due process rights.

42.   A judicial declaration is necessary and appropriate at this time so that Plaintiffs may ascertain their rights and duties as against TRN.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

**As to the First Cause of Action for Declaratory Relief:**

1.   For a judgment declaring the respective rights and duties of the parties under the Agreement, including in particular that TRN cannot match, and has not matched, each and every term of the Courtside Term Sheet.

**As to the Second Cause of Action for Declaratory Relief:**

2. For a judgment declaring the respective rights and duties of the parties under the Agreement, including in particular that the Agreement is a contract of employment for an indefinite period of time, and is, thus, voidable and terminable at will by either party.

**As to the Third Cause of Action For Declaratory Relief:**

3. For a judgment declaring the respective rights and duties of the parties under the Agreement, including in particular that the Agreement is unenforceable as against public policy.

**As to the Fourth Cause of Action For Declaratory Relief:**

4. For a judgment declaring the respective rights and duties of the parties under the Agreement, including in particular that the arbitration provision in the Agreement is unenforceable as it violates Plaintiffs' due process rights.

**As to All Causes of Action:**

5. For costs of suit, expenses and attorneys' fees incurred herein; and

6. For such other and further relief as the Court deems just and appropriate.

Dated: December 20, 2010      Respectfully submitted,

GLASER, WEIL, FINK, JACOBS,
HOWARD & SHAPIRO, LLP
PATRICIA L. GLASER
JILL BASINGER

HARVEY SISKIND LLP
IAN K. BOYD
SETH I. APPEL

By: _____
           Ian K. Boyd

Attorneys for Plaintiffs
DR. MICHAEL WEINER p/k/a MICHAEL SAVAGE
and SAVAGE PRODUCTIONS, INC.

1

**CERTIFICATION OF INTERESTED ENTITIES OR PERSONS**

2        Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the named

3    parties, there is no such interest to report.

4

5    Dated:  December 20, 2010                    Respectfully submitted,

6                                                 GLASER, WEIL, FINK, JACOBS,
                                                  HOWARD & SHAPIRO, LLP
7                                                 PATRICIA L. GLASER
                                                  JILL BASINGER
8

9                                                 HARVEY SISKIND LLP
                                                  IAN K. BOYD
10                                                SETH I. APPEL

11

12                                               By:   _____
                                                              Ian K. Boyd
13

14                                               Attorneys for Plaintiffs
                                                 DR. MICHAEL WEINER p/k/a MICHAEL SAVAGE
15                                               and SAVAGE PRODUCTIONS, INC.

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A
# TO COMPLAINT

# AGREEMENT

This AGREEMENT (this "Agreement") is entered into by and between THE ORIGINAL TALK RADIO NETWORK, INC. dba TALK RADIO NETWORK, INC. ("Network") and MICHAEL A. WEINER, Ph.D., aka MICHAEL SAVAGE ("Host"), as follows:

1. Term/Purpose.

    1.a.    Purpose.    Previous to the execution of this Agreement, Network and Host executed an independent contractor agreement between Network and Host for a term initially specified to commence December 1, 1999, and subsequently commencing on January 17, 2000 and ending on July 1, 2001 (the "Initial Agreement"), and an Option Agreement between Host and Network (the "Option Agreement"), which provided an option, later exercised, for a term commencing on July 2, 2001 and ending on November 30, 2004. This Agreement is intended to extend such term, and to restate the Option Agreement and various subsequent agreements and modifications to the Option Agreement in a single agreement resulting in the creation of this new single agreement between the parties.

    1.b.    Term.    The term of this Agreement (the "Term") for all purposes other than compensation as described in Paragraph 3.b below shall commence upon the execution of this Agreement (the "Signing Date") and end on the close of Host's working day on March 31, 2008 (the "New Expiration Date"), unless terminated earlier as provided under Paragraph 5 below. For purposes of compensation, the Term shall commence on January 1, 2003 and end on the close of Host's working day on March 31, 2008 unless terminated earlier as provided under Paragraph 5 below. During the period from the Signing Date until December 31, 2002, compensation amounts shall continue to be governed by the provisions of the Option Agreement and the letter agreement dated December 3, 2001.

2. Services:

    2.a.    Host Services.    Host will perform as an on-air personality and act as the host of the following radio show: The "Savage Show" or "The Michael Savage Show" (the "Show") for a block of three (3) hours per day between 4:00 PM and 7:00 PM Pacific Time, Monday through Friday (3 hours per day, five days per week). Network will not use the name "The Savage Nation," which is owned by Host. The exact time placement and airing of pre-feeds and re-feeds of the Show will be at Network's sole discretion. Host will not be required to travel for promotions or remote purposes without his consent. Host shall have editorial control over the content of the Show. Host agrees that such editorial control has limits and responsibilities which are as follows: that neither Host nor the content of the Show denigrates the Network, its management and employees, current advertisers of the Show or affiliates or by negligence creates legal liability or financial damage for the Network or its affiliates, or violates the rules and regulations of the Federal Communications Commission and any other applicable state or federal laws or regulations. In the event that any of the limits to Host's editorial control are exceeded, Network in its sole discretion reserves the right to take all necessary measures regarding content to protect the Show, Network and its affiliates from financial damage or legal liability. Any issues where Network reasonably, in good faith, acts to protect the Show, itself or its affiliates due to Host's limits being exceeded will not be considered a basis for a material breach of this Agreement. Host and Network agree that

WASHINGTON 758560/2

(ii)   Network agrees that it will provide the Show  to the San Francisco TSA station selected by Host in the same manner as Network provides the Show to any of its affiliate stations.

(iii)   Host agrees that he will not perform any radio show in the San Francisco Total Survey Area other than the Show.

7.  <u>Injunctive Relief.</u>  Network shall have no right to pursue injunctive relief, or any other action, against Host if Host is unable to perform due to illness or any other cause beyond Host's control, or for any inadvertent violation on Host's part which Host corrects in a reasonable manner after any such inadvertent violation is called to Host's attention.  Host and Network acknowledge that Host's talents, and Host's services and the rights to the results and proceeds of Host's services granted to Network, are of a special, unique value. In the event of a breach by Host resulting in a refusal to undertake the obligations of a live on-air radio host for Network (other a non-breach situation as noted above), or in undertaking such obligations for any competitor or third party, in violation of the provisions of this Agreement, Network shall retain the right to seek an action for specific performance to enforce both the obligation of performance by Host and the obligations not to perform a syndicated radio show for any competitor or third party as set forth in this Agreement.   Accordingly, injunctive and other relief against Host will be an appropriate remedy to enforce Network's rights. This does not, however, in any way constitute a waiver by Network of its right to seek damages or other remedies.  Solely for purposes of seeking injunctive relief or specific performance, Network shall be entitled to assert jurisdiction in California or Oregon. By executing this Agreement, Host agrees not to seek to enjoin or restrain the broadcast or other exploitation of any Programs or other use of the results and proceeds of Host's services, or any part thereof.

8.  <u>Arbitration:</u>  In the event that there is a dispute, that is not covered specifically herein, regarding any and all matters relating to our business relationship, it is agreed that the dispute shall be resolved by binding arbitration to be held in either Marin County or San Francisco County, California, and that Network witnesses may testify by telephone in any such arbitration.  It is further agreed that the arbitrator shall not be a lawyer and that the disputants shall not be represented by lawyers, but by themselves only.  Each party shall specify an arbitrator and the two arbitrators shall select the arbitrator for the arbitration.

We are fully aware of the provision of section 1282.4 of the California Code of Civil Procedure as shown below.  (Or of any applicable code if this Agreement is signed in any other state.)

Sec. 1282.4  (Right to Counsel)

A party to the arbitration has the right to be represented by an attorney at any proceeding or hearing in arbitration under this title.  A waiver of this right may be revoked but if a party revokes such waiver, the other party is entitled to a reasonable continuance for the purpose of procuring an attorney.

Initials: _____   _____            12 of 20
         MM       MAW
WASHINGTON 75850v2

We hereby, with full comprehension of our rights, agree to waive our rights to be represented by an attorney at any binding arbitration and shall not ask the court to revoke such waiver.

_____      Dec 20 2002
Mark Masters, CEO                     Date

_____      Dec. 20, 2002
Michael Weiner                        Date

If there is any future question as to the proper application or interpretation of this Agreement, for any reason, this Agreement will remain in full force and effect, and shall not be subject to termination prior to the agreed expiration date, under any circumstances. Termination shall not be a remedy for any ambiguity in this Agreement, or in any forum, including without limitation arbitration or any arbitration ruling. In any such event: (i) we will each continue to perform under this Agreement; (ii) we shall submit any such unresolved issue, question or dispute to binding arbitration for a determination as to any obligation or performance required by either of us; and (iii) we shall resolve any such question, issue or dispute in accordance with the final ruling in any such arbitration as to the specific obligation and/or performance required to comply with our agreements, and/or to resolve any ambiguity or other question arising or asserted with respect to our agreements.

9. <u>Notices</u>:  Any notice which either Host or Network desires, or is required, to give pursuant to this Agreement must be given in writing and delivered either personally, by US Mail certified with return receipt, by commercial overnight delivery service (e.g. Federal Express), or via facsimile with confirming copy personally delivered within 48 business hours, by US mail certified with return receipt requested, or by overnight delivery service, at the respective addresses set forth below:

If to Host:          Michael A. Weiner, Ph. D.
                     Six Knoll Lane, Suite E
                     Mill Valley, CA  94941

If to Network:       Mr. Mark Masters
                     225 NE Hillcrest Dr.
                     Grants Pass, OR 97526

or such other address as may be designated by such written notice by either party.  Notice shall be deemed given on the date of receipt by the addressee.  Charges not prepaid are to be billed to the sender.

10. <u>Confidentiality</u>:  Network and Host mutually agree not to disclose, or cause to be disseminated, to any person other than Host's and Network's respective agents,

Initials: _____  _____        13 of 20
          MM          MAW

Network. Host shall cooperate with Network in taking such actions as may reasonably be required or requested in order to apply for and/or secure such insurance, including submitting to requested medical exams. However Host shall not be required to submit to any colonoscopy. Any resulting costs, including without limitation the cost of any necessary medical exams, shall be paid by Network. The ability and/or election of Network to secure any such insurance on Host shall not be a condition to, or affect the validity of, any other agreement between Host and Network, including without limitation the other provisions of this Agreement.  If Network elects to procure such key-man life insurance on Host, any proceeds of such insurance policy shall be divided Fifty Percent (50%) to Network and Fifty Percent (50%) to such additional beneficiary or beneficiaries as Host may designate in writing from time to time.

19. <u>Right to Match</u>. Through the date which is one year after the New Expiration Date, Network shall have the right to match the terms of any contract Host is prepared to enter into for Host's future services in the radio broadcast industry, including without limitation any option agreements.  As such, through the first anniversary of the New Expiration Date, before entering into any contract or agreement of any kind for Host's services in the radio broadcast industry following the New Expiration Date, Host shall give to Network a written notice of Host's intent to contract, containing the principal terms of the intended contract (together with a copy of a term sheet which reflects the offer Host has been presented). Network shall then have the right to accept, by written notice issued to Host within ten (10) working days of Network's receipt of Host's notice, such contract terms, and, in so doing, establish a new contract between Host and Network on such terms and conditions.

20. <u>Release of Prior Claims</u>. Effective upon the Signing Date, Host and Network each release each other, and the officers, agents and representatives of the other, from any and all claims and liabilities for actions and/or inactions up to the Signing Date, with the sole exception of: (i) the continuing obligation by Network to pay any amounts then accrued and unpaid under the terms of this Agreement; and (ii) the mutual obligations of each of us from the Signing Date forward under the terms of this Agreement.  This release shall be governed under California law.  Host and Network agree that neither party has breached the existing contracts between Host and Network, and that there are no unresolved disputes between Network and Host.

21. <u>Television/Videotape</u>. In the event that the Show shall be televised and/or videotaped in the future, Network shall retain all rights to the Show, as televised and/or videotaped, but the resulting net revenues, after any commissions or other costs, shall be added to, and increase, the Net Program Revenues, and Host's share of the Net Program Revenues shall be increased accordingly.   With the sole exception of televised and/or videotaped broadcasts or other reproductions of the Show, Host shall have the right, for Host's own account, and without obligation to Network, to appear on television in whatever capacity, and on whatever contractual conditions, Host may choose, provided that any such weekday television appearances and/or commitments shall not interfere with Host's ability to perform Host's responsibilities with respect to the Show.  (A weekend television show is of no concern to Network).

Initials: _____   _____        17 of 20
              MM                  MAW

WASHINGTON 75850v2

# EXHIBIT B
# TO COMPLAINT

# TERM SHEET

## MATERIAL TERMS OF PROPOSED AGREEMENT
## BETWEEN
## COURTSIDE LLC & SAVAGE PRODUCTIONS, INC.
### (For the Services of Michael Savage)

The following are the material terms of the proposed agreement between Courtside LLC ("Courtside") and Savage Productions, Inc. ("SP"), for the services of Michael Savage ("Michael"), for the production and exploitation of a radio and television show to be hosted and produced by Michael, to be known as Savage Nation (the "Show").

1.    <u>The Show</u>:
      Daily (weekdays) 3 hour Show (two hours to be broadcast live. The third hour shall be produced on a pre-recorded basis by Courtside, consisting of excerpts from prior broadcasts and other material approved by SP. SP shall be free to add some live material to the third hour, at its discretion.)

      Hosted by Michael

      Similar to Michael's current show; recorded and exploited in both audio and visual media

      Courtside will pay all Show production costs, including production assistant and staff acceptable to SP. All production (including bookings, Show preparation, screening, mixing and recording) will be provided by Courtside, through the Show staff or otherwise. All technical costs (ISDN lines, connections and distribution costs) shall be borne by Courtside.

      Recording to commence January 1, 2011

      Broadcast/recording at Michael's home studios in Marin County, California, and/or at studios in San Francisco, California, and in Florida, or at a facility of mutual choice

      Courtside to distribute, license, syndicate and otherwise exploit the show in any versions and/or media, by visual, audio, or other means, as now known or hereafter discovered, as it may select, except that SP shall have approval rights (not to be unreasonably withheld) for uses of the show in visual mediums

Courtside to create and maintain an exclusive internet site for the Show, for streaming the Show, and for related promotional activities. The Show internet site will be separate and apart from SP and Michael's site(s), and Michael will plug the Show website twice daily during the Show; Courtside may provide links to SP and/or Michael's website(s), for the Show website. Courtside, and/or Westwood One, and SP will install and maintain such links throughout the Term. Michael and/or SP will retain exclusive control and enjoyment over their website(s), as their exclusive property.

2.   <u>Michael's Services</u>.
SP to provide Michael's services as reasonably necessary to produce and deliver Show, including reading commercial copy for program advertisers; Michael will not be required to travel or make personal appearances. Michael will not be required to read more than two ads per day on air, and he may refuse ads which make health/wellness/nutritional claims which he doesn't feel are appropriate. Michael will be free to cross-promote his books, separate website and other works and promotions, at his discretion, in the Show.

SP to grant of use of Michael's name and likeness for promotion, and to provide approved publicity materials for use in promotion of the Show.

Michael's services will be exclusive to Courtside during the Term as respects radio activities in any way whatsoever competitive with the Show, and as respects any and all visual media activities for any similarly formatted program

Michael to host the Show, except that he will be permitted thirty-five (35) days vacation, and reasonable sick leave. Michael will have approval rights for any guest hosts selected to host the Show in his absence.

3.   <u>Compensation to SP</u>.
Courtside will pay SP, semi-annually in arrears, no later than sixty (60) days after the end of every semi-annual period during and after the term, a sum equal to fifty percent (50%) of Courtside's "Adjusted Gross Receipts" in the prior semi-annual period from exploitation of the Show, less all advances by then paid to SP and not as yet then recouped from SP's participation in Adjusted Gross Receipts

"Adjusted Gross Receipts" to mean all Gross Receipts actually received from exploitation of the Show, less only radio station clearance fees paid or allowed by Courtside and approved by SP

Gross Receipts shall include all receipts from exploitation of the Show, inclusive of receipts of any of Courtside's distributors (i.e., Westwood One, RightNetwork, etc). For purposes of clarity, all commissions paid from syndication or sales side advertising bought on the Show shall not be charged to or deducted from Gross Receipts or Adjusted Gross Receipts, but shall be borne by Courtside out of its share of Adjusted Gross Receipts

Courtside shall pay SP, for the first year of the Term hereof, the sum of One Million One Hundred Thousand Dollars ($1,100,000), and, for the second year of the Term hereof, the sum of One Million Three Hundred Thousand Dollars ($1,300,000), each payable bi-monthly in arrears, as a guaranteed non-refundable advance, fully recoupable against SP's share of Adjusted Gross Receipts. Courtside will escrow One Million One Hundred Thousand Dollars ($1,100,000), the entire Advance payable for the first year, and funds will be released form escrow monthly in arrears, as due, to pay the Advance

4.    <u>Courtside Commitments</u>.
Radio station affiliation and advertising sales services will initially be provided by Westwood One pursuant to a separate distribution agreement.

Courtside to provide video and internet distribution through RightNetwork or other distributors of Courtside's selection, and other media distribution to be determined by Courtside

Courtside to provide, through Westwood One, weekly promotions of the Show and Michael, in the minimum amount of Five Hundred Thousand Dollars ($500,000) annually (calculated at then prevailing commercial rates), including commercial spots and live promotional spots and announcements in Westwood One programming inventory, including but not limited to NFL Football, NCAA Basketball, Metro Traffic, CNN News, NBC News, CBS News, Westwood One Talk Radio, Westwood One Talk Programming, and appropriate entertainment programming, and News, Sport & Entertainment Specials

Courtside to secure a non-exclusive agreement between Courtside and Right On Demand, LLC, dba RightNetwork (RightNetwork"), for a term of one year, renewable by mutual agreement for one additional year, to

tape by audio and visual means all Shows, and to create a Best of Savage video program show (the "Program"), to transmit, display, stream, embed, exploit, televise, and exhibit the Program, via analog, digital, and/or broadcast transmission, to cable systems, satellite systems, internet and wireless transmissions, mobile and other technology driven distribution outlets for airing, as well as use excerpts of the Program as part of RightNetwork's marketing campaigns, all subject to Courtside's reasonable prior approval

SP shall receive fifty percent (50%) of all Gross Receipts of RightNetwork from exploitation of the Program in any visual media

SP will also receive One Hundred Thousand (100,000) units of RightNetwork Class D units, currently representing 1% of equity participation in RightNetwork, 50,000 units (½) vested at the end of the first year (the original term), and 50,000 units (½) vested at the end of the second year of the term.

In the event Westwood One fails to generate Five Million Dollars ($5,000,000) in Gross Receipts per contract year of the Term of the Agreement (using months 4-15 for the first contract year) (the "Minimum"), and each prior contract year for each successive year thereafter), SP can require Courtside to give Westwood One 60 days notice of termination as provider of affiliation and advertising sales services; Westwood One then can, at its option, pay Courtside within said sixty (60) days Courtside (and SP)'s share of Adjusted Gross Receipts based upon the Minimum set forth herein, and Westwood One's agreement will not be terminated.   If Westwood One fails to pay based upon the Minimum, Courtside shall have the option, for an additional 60 days, to pay SP as if the Minimum of Gross Receipts had been received; if it fails to do so within the 30 days, the Agreement will then be terminable by SP upon written notice to Courtside.

Norman Pattiz to personally work with Michael to oversee all aspects of the project

Courtside will agree, and will cause Westwood to agree, that, under all circumstances, the Show shall be distributed on its regularly-scheduled basis throughout the Term (i.e., there is no pay-or-play alternative).

5.   <u>Term of Agreement</u>.
     Initial term: two (2) years, commencing January 1, 2011

     Neither SP nor Michael may engage in negotiations with any third party for Michael's services as provided to Courtside herein, for any period beyond the Term, until the last sixty (60) days of the Term

     Courtside to have 1st negotiation and 1st refusal rights

6.   <u>General</u>.
     The parties will adopt more formal and definitive documentation of their Agreement as soon as reasonably possibly, to contain industry standard terms and conditions

     Michael will personally execute traditional inducement agreements to assure provision of his personal services in satisfaction of SP's obligations under the agreement

COURTSIDE \ MATL TERMS, 11 17 10 FINAL

# EXHIBIT C
# TO COMPLAINT

HOST AGREEMENT

This HOST AGREEMENT (this "**Agreement**"), dated as of December 15, 2010, is entered into by and between THE ORIGINAL TALK RADIO NETWORK, INC. ("**Network**"), SAVAGE PRODUCTIONS, INC. ("**SP**") and MICHAEL A. WEINER, Ph.D., aka MICHAEL SAVAGE ("**Host**").  Network, Host and SP (individually, "**Party**" and, plural or collectively, "**Parties**") hereby agree as follows:

1.    TERM/PURPOSE.

    a.  Purpose.  Previous to the execution of this Agreement, Network and Host were parties to that certain agreement, dated October 20, 1999, for a term initially specified to commence December 1, 1999, and subsequently commencing on January 17, 2000 and ending on July 1, 2001 (the "**Initial Agreement**"), an option agreement between Host and Network  which provided an option, later exercised, for a term commencing on July 2, 2001 and ending on November 30, 2004 (the "**Option Agreement**"), a host agreement between Host and Network commencing as of January 1, 2003 and ending as of March 31, 2008 (the "**Host Agreement**"),  an addendum  entered into on January 25, 2008, extending the term of the Host Agreement to December 31, 2008 (the "**First Addendum**") and a second extension addendum, entered into by the Parties on November 20, 2008, and extending the Host Agreement through December 31, 2010 (the "**Second Extension Addendum**").  The Host Agreement contained a right to match pursuant to which Host issued a Notice of Intent to Contract offer to Network on November 17, 2010 and Network exercised its right to match, thus creating a new contract by and between the Parties on the right to match terms, on November 29, 2010.  Pursuant to such agreement, the Parties hereby memorialize this more formal and definitive documentation of the agreement resulting from Network's exercise of such right to match, with respect to the personal services of Host to serve as the host of that certain talk radio show produced and syndicated by Network under the name "The Michael Savage Show" (the "**Show**"), the daily versions of which shall be referred to individually as a "**Program**" and, plural or collectively, as "**Programs**".

    b.  Term.  The term of this Agreement (the "**Term**") shall commence on January 1, 2011 and end at midnight on December 31, 2012.

2.    THE SHOW/HOST SERVICES.

    a.  Host Services.  Host shall perform as an on-air personality and host of the Show, for a block of two (2) hours per day, five (5) days per week, Monday through Friday, for the live broadcast of the Show between 3:00 p.m. and 5:00 p.m. Pacific Time.  Network shall produce a third hour of the Show without the live services of Host, who shall have the right, but not the obligation, to record additional material to be broadcast between 5:00 p.m. to 6:00 p.m., Pacific Time, and/or to add some live material to the third hour.  The exact time, placement and airing of pre-feeds and re-feeds of the Show will be at Network's sole discretion.

b. <u>Host Location</u>. Host's services shall be performed from Host's home studios in Marin County, California, and/or at studios in San Francisco, California, and in Florida, or at a facility of mutual choice.

c. <u>Scope of Services</u>. Host's services will include, but are not limited to, announcing and hosting a talk show, advertiser/affiliate meetings, and performing commercial announcements and endorsements ("**Ad Reads**") for broadcast, as reasonably necessary to produce and deliver the Show and Ad Reads. All Ad Reads shall be of sufficient quality for the applicable read to be accepted by the advertiser. Host shall perform all Ad Reads requested by Network, subject to the limitations that Host will not be required to read more than two Ad Reads per day on air, and he may refuse Ad Reads which make health/wellness/nutritional claims which he doesn't feel are appropriate. Host, at Network's request, shall read a reasonable amount of liners for Network and/or affiliate stations, which may include commercial announcements for Network and the Show.

d. <u>Travel</u>. Host will not be required to travel or make personal appearances without his consent.

e. <u>Content</u>. Host shall ensure that neither Host nor the content of the Show denigrates Network, its affiliates, management, employees, service providers, sponsors, advertisers and/or station affiliates of the Show; creates legal liability for or financial damage to the Network or its station affiliates; or violates the rules and regulations of the Federal Communications Commission or any other applicable state or federal laws or regulations. Network in its sole discretion reserves the right to take all necessary measures regarding content to protect the Show, Network, its affiliates and/or station affiliates from financial damage or legal liability. Any instances in which Network reasonably and in good faith acts to protect the Show, itself, its affiliates and/or station affiliates pursuant to this paragraph will not be considered a basis for a material breach of this Agreement.

f. <u>Host Name and Likeness</u>. Host and SP hereby grant use of Host's name and likeness for promotion, and agree to provide approved publicity materials for use in promotion of the Show as requested by Network.

g. <u>Leave</u>. Host shall host the Show, except that he will be permitted thirty-five (35) days vacation, and reasonable sick leave.

3.   <u>NETWORK COMMITMENTS/SERVICES</u>

a. <u>Affiliate Marketing and Ad Sales</u>. Network shall have sole responsibility for all affiliate relations, marketing and advertising sales for the Show, which may be provided by third parties under separate agreements with Network. Host and Mark Masters will cooperate in scheduling bi-monthly meetings, whether in person or by telephone, during which Host may offer advice with regard to affiliate relations, marketing, and advertising sales for the Show, which Network shall consider in its sole and absolute discretion.

b. <u>Video Distribution</u>.  Network shall secure a non-exclusive agreement between Network and a video distributor (the "**Video Program Distributor**") for a term of one (1) year ("**Initial Video Term**"), renewable by mutual agreement of Network and the Video Program Distributor for one additional year ("**Extension Video Term**"), to tape, record and/or broadcast by any and all audio and visual means all Programs, and to create a "Best of Savage" video program (the "**Video Program**"), to transmit, display, stream, embed, exploit, televise, and exhibit the Programs, via analog, digital,  internet and wireless transmissions, broadcast transmission, and/or any and all other technologies currently or hereafter available, to cable systems, satellite systems, the Internet, mobile and other distribution outlets for airing, as well as to use excerpts of the Show as part of the Video Program Distributor's marketing campaigns.

c. <u>SP Equity in the Video Program Distributor</u>.  SP shall receive equity participation shares in the Video Program Distributor, in installments, for a total equity participation of 1% of the total equity share of the Video Program Distributer, half of which shall vest at the end of the Initial Video Term, and half of which shall vest at the end of the Extension Video Term.

d. <u>Network Promotion</u>.  Network will provide promotion and publicity for the Show and Host in an amount equivalent to Five Hundred Thousand Dollars ($500,000) annually, calculated at then-prevailing commercial rates, including commercial advertisements and live promotional advertisements and announcements in programming inventory of Network and any affiliated companies.

e. <u>Personal Coordination</u>.  Mark Masters (or other TRN personnel acceptable to Host) shall work personally and directly with Host to promote the Show, and Host shall cooperate with such efforts.  Mark Masters (or other TRN personnel acceptable to Host) and Host shall cooperate in scheduling conference calls at least every other week, absent their mutual agreement otherwise.

f. <u>Network's Use of Services</u>.  Network agrees that the Show shall be distributed and broadcast on its regularly scheduled basis throughout the Term (<u>i.e.</u>, there is no pay or play alternative).

g. <u>Production</u>.  Network shall produce the Show at Network's expense as to all Show production costs.  The production assistant and staff of the Show shall be acceptable to SP, which acceptance shall not be unreasonably withheld.  All production (including bookings, Show preparations, screening, mixing and recording) will be provided by Network, through the Show staff or otherwise.  All technical costs (ISDN lines, connections and distributions costs) shall be borne by Network.  The Show will be performed with equipment provided by Network at Network's sole expense, including installation of ISDN lines and a Telos system.  All telephone and ISDN expenses for said telephone lines will be billed directly to Network unless SP and Network mutually agree otherwise.  All costs for maintenance, repair and/or replacement of broadcast equipment will be borne by

Network.

h. <u>Show Website</u>.  Network shall create and maintain an exclusive internet site for the Show, for streaming the Show, and for related promotional activities.  The Show internet site will be separate and apart from SP and Host's site(s) and Host shall promote the Show website at least twice daily during each Program. Network may provide links to SP and/or Host's website(s) for the Show website. Network and SP will install and maintain such links throughout the Term.  Host and/or SP will retain exclusive control and enjoyment over their separate website(s), as their exclusive property.

i. <u>Expense Reimbursement</u>.  Providing that Network approves of an expense request in writing and in advance, Network will reimburse SP, within thirty (30) days after SP's submission of proper supporting vouchers in accordance with its standard policy, for customary, reasonable expenses incurred by Host and/or SP at the express request of Network.  If Host does agree to travel by air at Network's request, Network will pay for airfare for Host to do so at a minimum of business class travel.

j. <u>Marketing</u>.  Network shall work diligently to promote and market the national syndication of the Show.

k. <u>Separate Show Account</u>.  Network shall establish a separate Network bank account for "The Michael Savage Show" (the "**Account**").  Network shall deposit all Gross Receipts received by Network with respect to the Show into the Account, and shall disburse Host's revenue share pursuant to this Agreement. Host shall have the right to audit the Account, and total revenues received for the Show, on a calendar quarter by calendar quarter basis, at Network's facilities, during Network's normal working hours, within one year after the conclusion of the quarter to be audited, by giving ten days' advance written notice stating the day or days any such audit shall occur, and shall conclude any such audit within thirty (30) days of the first audit date; provided, however, that there shall be no more than one audit session (which may extend for more than one day and be applicable to more than one quarter) scheduled during any calendar quarter. Any such audit may be conducted by a professional auditor(s) approved by both Host and Network, provided that any such auditor(s) shall execute a nondisclosure agreement, acceptable to Network and Host, which restricts disclosure of any information to Host and/or Network.

4. <u>EXCLUSIVITY.</u>  Neither SP nor Host may engage in negotiation with any third party for Host's services as provided to Network herein, for any period beyond the Term, until the last sixty (60) days of the Term.  Host shall not, directly or indirectly, engage in, or authorize or permit the use of Host's personal services, voice, name and/or likeness in connection with any radio business other than the broadcast business of Network, or any visual media activities other than those expressly permitted under this Agreement.  In no event shall Host render services for anyone else in any area in which rights have been specifically granted to Network by Host under this Agreement.

5.   <u>COMPENSATION.</u>  The full compensation for all services of Host, and all rights of Host and/or SP under this Agreement and/or with respect to the Show and all services of Host with respect to the Show, will be as follows:

a.   <u>Advance.</u>  Effective January 1, 2011, Network shall pay to SP an annual guaranteed advance in the amounts specified in the following schedule:

| <u>Year</u> | <u>Annually</u> | <u>Per Month</u> | <u>Per Installment</u> |
|------|---------|----------|-----------------|
| 2011 | $1,100,000.00 | $91,666.68 | $45,833.34 |
| 2012 | $1,300,000.00 | $108,333.33 | $54,166.67 |

Such amounts shall be payable in arrears, in two installments per month, on the 15$^{th,}$ and again on the last, day of each month, as a guaranteed non-refundable advance, fully recoupable against SP's share of Adjusted Gross Receipts pursuant to subparagraph 5.b below.  Network will escrow One Million One Hundred Thousand Dollars ($1,100,000.00), the entire amount of the Advance for the first year, and funds will be released from such escrow bi-monthly in arrears, as due, to pay the Advance during the first year.

b.   <u>Revenue Split.</u>  Network shall pay to SP Fifty Percent (50%) of all Adjusted Gross Receipts as defined below in this Paragraph 5.b, semi-annually in arrears, no later than sixty (60) days after the end of every semi-annual period during and after the Term, less all portions of the Advance by then paid and not as yet recouped from SP's participation in Adjusted Gross Receipts.  "**Adjusted Gross Receipts**" shall be defined as all Gross Receipts actually received by Network, and Network's contracted rep firms and/or the Video Distributor from exploitation of the Show, less radio station clearance fees   paid or allowed by Network and approved by SP.  Gross Receipts shall include all receipts from exploitation of the Show by or on behalf of Network, and shall include all revenue actually received by Network generated from the Show (including but not limited to all revenue attributable to all hours of the Show broadcasts regardless of whether such hours contain live performances from Host), including without limitation revenue for live Ad Reads, base fees, tape revenues and program memorabilia.  For purposes of clarity, all commissions paid from syndication or sales side advertising bought on the Show shall not be charged to or deducted from Gross Receipts or Adjusted Gross Receipts, but shall be borne by Network out of its share of Adjusted Gross Receipts.  Under no circumstances shall any such commissions or other equivalent consideration be deducted from Host's share of Adjusted Gross Receipts.

c.   <u>Annual Threshold of Adjusted Gross Receipts.</u>  If the Show fails to generate Five Million Dollars ($5,000,000.00) in Adjusted Gross Receipts (the "**Minimum**") in the period between April 1, 2011, and March 31, 2012 ("**First Year Receipts Period**"), or in each contract year thereafter SP can require Network to give its affiliate relations and advertising sales provider(s) sixty (60) days notice of termination as provider of affiliation and advertising sales services.  Such providers(s) then can, at its/their option, pay Network within said sixty (60) days

Network's (and SP's) share of Adjusted Gross Receipts based upon the Minimum, as set forth herein, and its/their agreement(s) will not be terminated. If such provider(s) fail(s) to pay based upon the Minimum, Network shall have the option, for an additional sixty (60) days, to pay SP as if the Minimum (of Adjusted Gross Receipts) has been received, resulting in a total of at least $2.5 million paid to Host during the First Year Receipts Period. If Network fails to do so within such period, this Agreement may then be terminated by SP upon written notice to Network.

6.   <u>TERMINATION AND SUSPENSION.</u>  This Agreement shall terminate:

a.  Upon mutual agreement of the Parties, set forth in a writing signed by each party.

b.  Immediately upon written notice from Network to Host if, in the judgment of Network's management: (i) Host is unable to perform fully all of his services because of any physical or mental disability or other limitation, despite reasonable accommodation, for a period of thirty (30) or more consecutive broadcast days or thirty (30) broadcast days in the aggregate during any year; (ii) Host commits any act in the course of his services for Network that constitutes fraud or substantial and deliberate dishonesty; (iii) Host commits any act resulting in public scandal or fails to perform his services under this Agreement without reasonable justification; or (iv) Network discontinues its regular broadcasting activities for a period of two or more consecutive weeks by reason of an act of God, fire or other casualty, a strike or other labor dispute, government action, or order or decree, armed conflict, or other causes outside of Network's control. If Network does terminate this Agreement pursuant to sub-clause (iv) of this Paragraph 5.G, Host shall be free to enter into any new contract or arrangements Host chooses for Host's services without any obligation whatsoever to Network after a thirty (30) day grace period for Network, during which Network may reinstate this Agreement in its entirety. Absent termination, in any such event this Agreement shall be suspended, effective upon the date of any determination by Network that Host is unable to continue Host's broadcasting career.

c.  Network may suspend payment of compensation to SP for any period of time during which Host does not work (subject to Host taking any sick days to which Host may be entitled in connection with an illness or disability, pursuant either to the Agreement or federal or state law) because of the events described in Paragraph 5.b above, whether or not this Agreement is terminated.

d.  Upon the occurrence of any failure to cure a curable material breach. The term material breach shall include either party's material failure, neglect, refusal or nonperformance, at any time, of the duties or obligations set forth in this Agreement. With regard to any event that constitutes a material breach hereunder, the breaching party shall be entitled to written notice thereof (**"Material Breach Notice"**) and, if capable of being cured, shall have a thirty (30) day period after receipt of a Material Breach Notice in which to affect a cure. If the breaching Party fails to affect a cure of a curable material breach within the

thirty (30) day period, the other Party shall have the right, but not the obligation, to then terminate the Agreement by written notice of termination issued prior to the cure of such breach by the breaching Party. In the event that the Parties disagree about whether a material breach has occurred, this Agreement shall remain in full force and effect until such time as any Dispute Resolution under Paragraph 8 has occurred and, if applicable, the breaching Party shall fail to cure a curable breach pursuant to the determination in such Dispute Resolution, within thirty (30) days of such determination.

e.  Immediately, without notice or other act, upon Host's death.

f.  In the event of a termination of this Agreement pursuant to the terms of Paragraph 5.a (including sub-clauses (i), (ii) and (iii) of Paragraph 5.a, but excluding sub-clause (iv) of Paragraph 5.a) or 5.b above, Host shall not perform for or during, broadcast or produce any radio program of any type for a period of ninety (90) days, and shall not perform for or during, broadcast or produce any radio program for one year within any geographical area in the United States where the broadcast of the Show was available to the general public through radio broadcast. Host specifically acknowledges that this provision is reasonable in time and broadcast area.

g.  In the case of any such termination or suspension, Host and Network shall each be responsible for performance of their respective obligations up to such termination or suspension date, and neither Host nor Network shall be responsible to the other for future payments or lost revenues or any potential damages for the period of any such termination or suspension, with the exception of Network's continuing obligation for payments, if any, due to Host under Paragraph 5 above. Network shall not, however, have any obligation to pay any portion of the Advance to SP for any period in which this Agreement is suspended or terminated, or for any period in which Host fails to perform other than due to vacation days and/or sick days provided for in this Agreement. If the reason for early termination or suspension of this Agreement is the health of Host and Host later returns to his broadcasting career, Network shall retain the option to reinstate this Agreement for a period of time equivalent to the remainder of the term of this Agreement. If Host is later able to return to broadcasting, Host will give Network not less than thirty (30) days written notice of Host's ability to return to broadcasting, and Network shall then have the right to elect to continue under the terms of this Agreement. If Network so elects to continue under the terms of this Agreement: (i) this Agreement shall continue in effect; and (ii) any calendar year or other date references will be altered to treat the period of termination or suspension as if no calendar days expired during such period (i.e., all dates and time periods will be revised accordingly). If Network does not so elect to continue this Agreement in effect, Host will then be entitled to make any new contractual arrangements Host wishes.

h.  If Network goes out of business or suffers any involuntary seizure of its assets which prevents Network from producing or otherwise broadcasting the Show; provided, however, that if Network shall continue to meet Network's obligations

to Host under this Agreement, Network shall have a grace period of sixty (60) days to overcome any such event and to resume Network's broadcasting of the Show.

i.   In the event of any termination pursuant to this Paragraph 6, all compensation due SP will be prorated through the date of termination and paid to SP.  SP and Host shall not be entitled to any other compensation or benefits which would otherwise be payable or deemed to be earned after the date of termination. Earned revenues that occurred before the termination date shall be paid to SP per the payment clauses of this Agreement.

j.   Survival.  Following any termination or expiration of this Agreement, this Agreement shall have no further force and effect, except for such provisions as expressly survive by their terms, or which would survive the normal expiration of the term of this Agreement by the passage of time (i.e. covenant not to compete, indemnities, etc.).

7.   INJUNCTIVE RELIEF.  Host and SP acknowledge that Host's talents, and Host's services and the rights to the results and proceeds of Host's services granted to Network, are of a special, unique value.  In the event of a breach by Host resulting in a refusal to undertake the obligations of a live on-air radio host for Network (other a non-breach situation as noted above), or in undertaking any such obligations for any competitor or third party, in violation for the provisions of this Agreement, Network would not have any adequate remedy available at law.  Accordingly, Network shall retain the right to seek an action for specific performance to enforce both the obligation of performance by Host and the obligations not to perform a syndicated radio show for any competitor or third party as set forth in this Agreement.  The Parties consent and agree that injunctive and other relief against Host and SP will be an appropriate remedy to enforce Network's rights.  This does not, however, in any way constitute a waiver by Network of its right to seek damages or other remedies.  By executing this Agreement, Host and SP agree not to seek to enjoin or restrain the broadcast or other exploitation of any Programs or other use of the results and proceeds of Host's services, or any part thereof.

8.   DISPUTE RESOLUTION.  In the event of any dispute between the Parties relating to this Agreement and/or the obligations and/or entitlements of any Party under this Agreement, the Parties shall continue with and complete all undisputed performance capable of completion prior to resolution of the dispute, and the dispute or disputes shall be subject to resolution by mediation and/or arbitration and/or civil litigation, as follows:

a.   Meet and Confer.  The Parties shall endeavor in good faith to physically meet and confer with each other on a direct, personal, and confidential basis, without participation of counsel, in an effort to resolve any such dispute or disputes. A Party shall be deemed to have undertaken such good faith efforts if such Party has offered to be available for not less than three separate meeting times of reasonable duration during not less than a ten day period of time from the date of issuing a written request to meet and confer, identifying the claims to be

addressed and available meeting times and places. Those good faith efforts shall be deemed to be unsuccessful if no resolution of the dispute is achieved during such period.

b. <u>Mediation</u>. At the request of any Party following unsuccessful good faith efforts of such Party to resolve their claim(s) through direct and confidential meet and confer efforts, the Parties shall endeavor to mediate any such claim(s) in good faith. If the Parties are unable to agree on the specific mediation procedures to be used, at the written request of any Party, the mediation shall proceed on a confidential basis in accordance with the commercial mediation rules of the American Arbitration Association ("**AAA**") currently in effect, with Network advancing one-half of any filing, administrative and/or mediator fees, and SP and/or Host advancing the other half, and with the mediation to occur at a location selected by the mediator(s) in Oregon, unless the parties agree on another location, at a date and time selected by the mediator(s) if not otherwise agreed to by the Parties.

c. <u>Arbitration</u>. If the Parties are unable to resolve the dispute(s) by mediation after good faith participation in not less than one full mediation session, then, upon the written request of any Party, or if no mediation has transpired within sixty (60) days of a written request, and no portion or such failure is due to any failure or unavailability of the requesting Party, such dispute(s) shall be subject to binding and confidential arbitration. If the Parties are unable to agree on the specific arbitration rules and procedures to be used, the arbitration shall be conducted on a confidential basis before a panel of arbitrators in accordance with the commercial arbitration rules of the American Arbitration Association ("**AAA**") then in effect, including without limitation all rules as to payment of filing, administrative and/or arbitrator fees. Unless the Parties shall otherwise agree, the arbitration shall occur in Oregon, at a location, date and time specified by the arbitrator(s). Any resulting arbitration award shall be binding on the Parties and duly enforceable, subject to any procedural rules in effect in such arbitration for reconsideration of any such rulings by the arbitrator(s).

d. <u>Litigation</u>. Notwithstanding any provision to the contrary in this Paragraph 8, Network, at Network's sole discretion, may proceed immediately to civil action, without first pursuing either mediation or arbitration, in the event of any actual or claimed violation of any provisions regarding exclusivity, right to match, confidentiality or non-disparagement, should Network seek to obtain a restraining order, a preliminary or permanent injunction, declaratory relief and/or other equitable relief whatsoever, whether exclusively and/or in combination with any other request for relief, with respect to any such claimed violation of the provisions regarding confidentiality or non-disparagement in this Agreement.

e. <u>General Provisions</u>. The final ruling, award, order and/or judgment in any such proceeding ("**Determination**") shall establish the specific obligation and/or performance required to comply with this Agreement, and shall resolve any ambiguity or other question arising or asserted with respect to this Agreement. The Parties shall then each perform their respective obligations under this

Agreement in accordance with such Determination.  However, in no event shall any such Determination result in termination of this Agreement, and termination of this Agreement shall not be available as a remedy in any such proceeding.

f.  <u>Continued Performance</u>.  Should either Party assert that the other Party is in breach of this Agreement, such Party shall utilize the Dispute Resolution provisions of this Paragraph 8, but shall continue such Party's performance under this Agreement through the Dispute Resolution process and thereafter while this Agreement remains in effect.

9.  <u>NOTICES.</u>  Any notice which any Party desires, or is required, to give pursuant to this Agreement must be given in writing and delivered either personally, by US Mail certified with return receipt, by commercial overnight delivery service (e.g. Federal Express), or via e-mail or facsimile with confirming copy delivered within 48 business hours, by personal delivery, or by US mail certified with return receipt requested, or by overnight delivery service, at the respective addresses set forth below:

If to Host:         Michael A. Weiner, Ph.D.
                    150 Shoreline Highway, Suite E
                    Mill Valley, CA 94941
                    E-Mail:  Savagemikesavage@aol.com

If to SP:           Savage Productions, Inc.
                    150 Shoreline Highway, Suite E
                    Mill Valley, CA 94941
                    E-Mail:  Savagemikesavage@aol.com

If to Network:      The Original Talk Radio Network, Inc.
                    225 NE Hillcrest Dr.
                    Grants Pass, OR 97526
                      Attn:  Mark Masters
                      Fax:  (541) 471-1663
                      E-Mail:  mark@trn1.com

or to such other address as may be designated by such written notice by either party.  Notice shall be deemed given on the date of receipt by the addressee. Charges not prepaid are to be billed to the sender.

10.  <u>CONFIDENTIALITY.</u>  Except as specifically required by law, the Parties mutually agree not to disclose, or to permit the disclosure of (1) the terms and conditions of this Agreement  and (2) any information relating to the revenue and/or financial performance of the Show, to any person other than the Parties' respective agents, employees, attorneys and other such appropriate persons who have a need to know, who are themselves obligated to preserve in confidence and not disclose any such information,.  Prior to making any disclosures required by law, the Party compelled to make such disclosure shall notify the other Party and afford the other Party a reasonable opportunity to contest, or to obtain a protective order with respect to, any such disclosure.

11.   <u>PERSONAL INTERESTS.</u>  Host shall have the right, subject to any applicable FCC requirements, as any such requirements may change over time, to mention any book Host has written, or will write, Host's website, and any other works or promotions in which Host has an interest, on the Show, provided that any such mentions shall be incidental to the principal content of any daily Program.

12.   <u>SEPARATE RIGHTS.</u>

a.   <u>Host's Rights.</u>  Host and SP grant Network exclusive rights to syndicate, produce, and disseminate the Show through all syndicated national radio and, local radio means, and to Host's name and likeness for purposes of such promotion, production and syndication, and to all audio and visual media activities for any program derived from or resembling the Show, reserving all rights of Host and SP not granted to Network in this Agreement.  Host shall retain all other visual medium rights, including but not limited to film, television, and webcasting, to any Host material unrelated to the Show, without any obligation to Network.

b.   <u>Network's Rights.</u>  All Programs and recordings of Host's performances of the Show, and all rights therein, shall be the sole and absolute property of Network. All rights in and to the format of Network and all program titles and pseudonyms used by Host in the course of performing Host's services shall be the sole and exclusive property of Network, except for Host's name and any pseudonyms Host has regularly and continually used prior to Host's retention by Network, such as "The Savage Nation."  To the extent, if any, that Host retains any right, title or interest in or to any of the results of Host's services in radio, Host hereby assigns all of such right, title and interest to Network during the Term of this Agreement.  Network shall have the broadest possible right to cut, edit, change, add to or subtract from any recordings or other materials which include the results of Host's services, and to combine one Program with other Programs, and Host hereby waives all so-called "author's rights" and rights of "droit moral." Network may exploit and turn to account any and all such rights granted to it and the Programs and recordings of Host's performances, in any manner and by any means whatsoever, now or hereafter known or devised, including, but not limited to, by broadcast and rebroadcast over Network and/or any other company, whether on a sustaining or commercial sponsored basis.  All revenue arising from any and all such exploitation shall be included in Adjusted Gross Receipts. For the purpose of this Agreement, the terms "recording" and "recordings" include any recording or recordings made (whether before, during or after broadcast transmission), by tape, digital medium, film, disc or any other similar or dissimilar methods of recording audio and/or visual portions of programs, whether now or hereafter known or devised.

c.   <u>Name and Likeness.</u>  Network, the sponsors of the Show (if any), and their advertising agencies (if any), shall have the right, and may grant to others the right, to use Host's name, pseudonyms, likeness, voice and biographical material

11

for advertising, publicity and promoting for the Show and in connection with the business of Network and the exercise of any rights granted to Network in this Agreement, including, but not limited to, subsidiary rights in Programs; provided that Host's name or likeness shall not be used as an endorsement of any product or service without Host's prior written consent.  SP shall provide approved publicity materials for use in promotion of the Show.

13. <u>SUBSTITUTE HOSTS.</u>  Network shall consult with Host as to the substitute hosts to be used when Host is unavailable, due to vacation or illness, to do the Show live, and to use substitute hosts acceptable to Host, which acceptance shall not be unreasonably delayed or withheld.  In the absence of any substitute host reasonably acceptable to Host, Network shall broadcast a "best-of" Show.  If Network provides a guest host and Host neither disapproves nor approves such guest host within three hours of live broadcast, Network shall have the right to use such substitute host.

14. <u>ASSIGNMENT.</u>  Because this Agreement involves Host's personal services, neither Host nor Network may assign Host's rights or obligations under this Agreement at any time without the mutual written consent of the Parties.

15. <u>PAYOLA.</u>  Host has been advised of the provisions of Section 317 and 508 of the Federal Communications Act and the regulations adopted by the Federal Communications Commission implementing these sections.  Host warrants and represents to Network that, in connection with any services or materials furnished to Network, Host has not accepted or agreed to accept, or paid or agreed to pay, any money, service or other valuable consideration for the inclusion in any Program of any matter contemplated by such sections and regulations.  Host further warrants and represents that Host has not and will not accept or agree to accept, or paid or agree to pay, any money, service or other valuable consideration for the inclusion of such matter in any Program, and Host will give Network forthwith any information Host acquires which might alert Network that an announcement was required pursuant to the above statutes and regulations.  In addition, Host warrants that Host (and Host's immediate family) does not have, and will not acquire, a hidden financial interest in the sale to the public of a service or commodity.  If Host (or Host's immediate family) does acquire such a hidden financial interest, Host warrants that Host will immediately give Network notice forthwith of any information to that effect so that an appropriate announcement may be made.

16. <u>INDEMNIFICATION.</u>

   a. <u>Host Indemnity.</u>  Host shall indemnify and hold harmless Network, its officers, directors, agents and employees, the sponsors of Programs and their advertising agencies, Network's licensees, purchasers of the Programs, and their respective officers, directors, agents and employees, from and against any and all loss, liability, damage, penalty and other expense, including attorneys' fees, caused by or arising out of (i) any performance or utterance (ad lib or otherwise) made by Host in or in connection with any Program, or (ii) the use of any other material furnished by Host hereunder, or (iii) the breach of any term and condition of this Agreement by Host.  Network's approval of any material furnished by Host shall

not constitute a waiver of Host's indemnity with regard thereto.  Network will, if possible, obtain insurance, at its sole expense, under a single policy for both this Paragraph 16.a, and Paragraph 16.b below.  In the event a single policy cannot be obtained, Network shall reimburse Host for the purchase by Host of insurance used to indemnify Network as called out in this Paragraph 16.a.  Host shall obtain quotes for this insurance and receive approval of Network before entering into a contract with an insurance company for the purpose of indemnifying Network.

b. <u>Network Indemnity.</u>  Network will similarly indemnify and hold Host harmless from and against any and all loss, liability, damage, penalty and other expense (including reasonable attorneys' fees) caused by or arising out of Host's broadcasting any material supplied by Network (which includes news received from wire services); provided, however, that Host shall promptly notify Network of any such claim or threatened litigation.  Network may, at its election, assume the defense of any such claim or litigation.

c. <u>Survival of Obligations.</u>  Notwithstanding any other provisions of this Agreement to the contrary, the expiration, termination or suspension of this Agreement will not affect these continuing indemnity obligations, which shall survive any expiration, termination or suspension of this Agreement.

17.    <u>EXCLUSIVE NEGOTIATION/RIGHT TO MATCH</u>:  Network shall have the exclusive right to negotiate with Host concerning Host's services as a personality/host in the field of talk radio during the Term.  At least six (6) months prior to the termination of the Term, Host will engage in exclusive good faith negotiations with Network for extension of this Agreement on mutually agreeable terms.  Host shall neither entertain nor accept any proposals for such services by Host from third parties during the period in which Host is obligated to provide Host's services in the field of talk radio exclusively to Network until the sixty (60) day period prior to the expiration of this Agreement (the "**Exclusive Period**").  From the end of the Exclusive Period onward, Host may entertain, solicit and negotiate with respect to offers from third parties for Host's services as a personality/host in the field of talk radio; provided, however, that, for a period of twelve (12) months following any expiration and/or termination of this Agreement (the "**Right to Match Period**"), Network shall have the right to match any third party offers for Host's services as a personality/host in the field of talk radio.  Host shall forward immediately any such bona fide written offer that is generated and/or received prior to or during the Right to Match Period, and Host shall disclose all terms thereof, including the name of the offeror, and shall provide a signed statement that he is willing to accept the offer and willing to enter into an agreement with Network on terms that match those of the bona fide offer he intends to accept ("**Matchable Offer**").  Network shall have fourteen (14) days from the later of Network's receipt of any such Matchable Offer or the expiration of the Term (the "**Match Period**") to match the Matchable Offer, by giving written notice to such effect to Host; provided, however, that Network shall have no obligation to pay moneys otherwise due under any such Matchable Offer, whether characterized as a signing bonus, advance, or otherwise, prior to the expiration of the Term.  If Network fails to match any such Matchable Offer during the Match Period, Host will have the

right to accept the specific Matchable Offer Network declined to match, and to contract with another syndicator on the specific terms of such Offer.  In such event, Host will provide to Network, immediately upon its execution and delivery, a copy of the fully-executed contract between Host and the party making the Matchable Offer accepted by Host, as verification of its terms and its compliance with the Matchable Offer.

18.   <u>CHOICE OF LAW.</u>  This Agreement is delivered in the State of Oregon.  It shall be governed by the laws of the State of Oregon.  Each Party expressly consents to the personal jurisdiction of the Oregon state and federal courts for any lawsuit or other proceeding relating to this Agreement, and agrees that venue in any federal or state court in Oregon is appropriate.

19.   <u>GENERAL.</u>  If any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect, this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained in it, which shall not affect any other provision of this Agreement.  A waiver by any Party of any of the terms and conditions of this Agreement in any one case shall not constitute a waiver of such term or condition in any other case or in the event of any subsequent breach.  All remedies, rights, undertakings, obligations, and agreements shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, obligation, or agreement of either any Party.  Upon mutual execution and exchange of this Agreement, this Agreement shall constitute the entire agreement between the Parties and may only be modified by subsequent written agreement, duly executed and exchanged by and between the Parties.

20.

THE ORIGINAL TALK RADIO NETWORK, INC.


By _____
    Mark Masters, CEO

Date:  December _____, 2010


    _____
    MICHAEL A. WEINER, Ph.D.
    aka MICHAEL SAVAGE

Date:  December _____, 2010


SAVAGE PRODUCTIONS, INC.


By: _____
    Michael A. Weiner

Date:  December _____, 2010