David Griffith (SBN CA170172)
Stewart Humpherys Molin & Griffith, LLP
3120 Cohasset Rd
Professional Plaza, Ste 6
Chico, CA 95973
(530) 891-6111
david@chicolaw.com

John M. Shoreman (SBN 407626)
McFadden & Shoreman
1050 Connecticut Avenue, NW
Washington, DC 20036
(202) 772-3188
Fax (202) 204-8610
jmshoreman@verizon.net

Attorneys for Defendant

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DR. MICHAEL A. WEINER, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>THE ORIGINAL TALK RADIO NETWORK, INC.<br><br>Defendant. | Case No. C10-5785 YGR<br><br>**DEFENDANT'S MOTION TO VACATE ARBITRATION AWARD AND, IN THE ALTERNATIVE, FOR ENTRY OF ORDER SCHEDULING FURTHER EVIDENTIARY HEARING; MEMORANDUM**<br><br>Hearing Date: December 11, 2012<br>Time: 2:00 p.m.<br>Department: 5<br>(Hon. Yvonne Gonzalez Rogers) |

COMES NOW, Defendant **THE ORIGINAL TALK RADIO NETWORK, INC.** (hereinafter "**OTRN**"), through counsel, and moves the Court, and on December 11, 2012, at 2:00 p.m., in Department 5 of the above-captioned Court, shall move, pursuant to 9 U.S.C. §10(a),

for an Order vacating the arbitration award issued in favor of Plaintiffs **DR. MICHAEL A. WEINER, aka <u>MICHAEL SAVAGE</u>** (hereinafter "Dr. Savage") and **SAVAGE PRODUCTIONS, INC.** (hereinafter "SPI") (collectively "Savage") on September 27, 2012 or, in the alternative, for an order scheduling further evidentiary hearings.

OTRN requests the Court enter an Order vacating the arbitration award, removing both the arbitration panel and the American Arbitration Association ("AAA") from any further proceedings, and remanding this matter for a rehearing consistent with the parties' Agreement. In the alternative, OTRN moves the Court for entry of a scheduling order setting forth further evidentiary hearing dates following such discovery pursuant to the Federal Rules of Civil Procedure as the Court shall determine to be appropriate pursuant to OTRN's Motion for Leave to Take Limited Discovery in Post-Arbitration Proceedings to be filed shortly with the Court.

## I. <u>INTRODUCTION AND STATEMENT OF THE ISSUES</u>

The dispute between Savage and OTRN arises from a contract for Savage to perform a live on-air radio show, "The Michael Savage Show" ("the Show"), for OTRN. By Orders dated March 14, 2011 **(Exhibit 1)** and April 22, 2011 **(Exhibit 2)**, the Court stayed this action and sent the parties to arbitrate their

disputes before the American Arbitration Association ("AAA"). Pursuant to AAA's Commercial Rules of Arbitration, a three-member arbitration Panel was subsequently selected to conduct the arbitration. As per the Panel's own indication in two of its orders, it was to issue a *reasoned* award.[1] After extensive briefing and presentation of evidence over a seven-month period regarding preliminary issues raised by Savage, the Panel issued an interim order on choice-of-law and an interim award on whether OTRN properly exercised its "right to match" an offer made to Savage by a third party.

A final hearing of remaining issues was held on August 13, 2012. Pursuant to an amended scheduling order dated May 29, 2012, OTRN submitted its direct case in the form of voluminous written testimony and documentary evidence. OTRN established its contract claims against Savage and resulting damages by overwhelming evidence.[2] However, in sharp contrast to its prior rulings, the Panel's final award, issued on September 24, 2012 (the "Final Award") summarily dismissed all of OTRN's claims without adequate explanation **(Exhibit 5)**.

---

[1] The Panel's Report of Preliminary Hearing and Scheduling Order of August 8, 2011, required the Panel to "state the reasons on which the decision" is based. **(Exhibit 3)**. The Panel's Report of Further Preliminary Hearing and Amended Scheduling Order of May 29, 2012, which governed the final award, maintained the requirement of a reasoned award by references back to the August 8, 2011 order **(Exhibit 4)**.

[2] OTRN will be filing a separate motion seeking to file the entire arbitration record under seal. Excerpted and redacted portions of the record have been marked exhibits to this motion and filed herewith for this Court's convenience in its initial consideration of OTRN's motion.

In what can only be described as an egregious dereliction of duty, the Panel ignored OTRN's entire case and awarded Savage money damages and released Savage from its contract with OTRN based on an erroneous assertion that OTRN's lawful exercise of its right to setoff or recoupment constituted a material breach of the contract and permitted immediate termination of the contract **(Exhibit 5)**. The Panel awarded Savage $745,543.60, the amount of OTRN's setoff or recoupment, terminated the contract with immediate effect, and ordered OTRN to reimburse Savage $79,122.42 for Savage's portion of the arbitration fees and costs **(Exhibit 5)**. On October 10, 2012, AAA returned $45,292.64 of OTRN's arbitration deposit, over one-third the amount it was required to deposit for the case. That is telling evidence that the Panel spent almost no time considering the voluminous evidence and complex claims before issuing its award.

The impropriety in the Panel's decision, as further addressed below, resulted from a campaign of intimidation by Savage that took the form of explicit threats against the Panel and AAA in a series of *ex parte* communications, as well as other failures on the part of the Panel. The disputed award was procured through misconduct and corruption. The Panel reneged on its obligation to impartially resolve the dispute by its failure

to consider OTRN's evidence and by its manifest disregard of established legal principles.

## II. <u>SUMMARY OF FACTS: NATURE OF CLAIMS AND PROCEDURAL HISTORY</u>

After an initial contract period commencing in 2000, OTRN and Dr. Savage negotiated a fully restated and integrated agreement to cover all aspects of their dealings in 2002 ("the 2002 Agreement"). Paragraph 8 of the 2002 Agreement contains the parties' arbitration clause **(Exhibit 6)**. There were two addenda to the agreement, the second of which set the contract's expiration date at December 31, 2010. Prior to that date, Savage sought out and obtained an offer from Courtside, LLC. The offer was embodied in a sheet describing some of its key terms and details ("Courtside Term Sheet"). The new contract governing the parties' relationship under the Courtside Term Sheet was referred to in the arbitration as the Match Agreement.

The parties were originally before this Court on Savage's Complaint that alleged OTRN had not exercised its right to match the Courtside Term Sheet, pursuant to paragraph 19 of the 2002 Agreement. By orders dated March 14, 2011 **(Exhibit 1)** and April 22, 2011 **(Exhibit 2)**, Judge Susan Illston ordered that the arbitration clause **(Exhibit 6)** governed the dispute, stayed the case, and ordered arbitration using AAA. The court noted that

the parties agreed that Oregon law applied to the claims **(Exhibit 1)**.

The claims and counter-claims that the parties arbitrated were far more extensive than those in Savage's Complaint filed in this Court. Savage's primary claims were disposed of by reasoned interim rulings in the arbitration. First, by order dated September 23, 2011, the Panel denied Savage's motion for judgment on the pleadings by way of a reasoned written 4-page order concluding that section 2855 of the California Labor Code (the "deHavilland law") regarding limitation on length of personal services contracts was not applicable and that the parties' relationship was governed by Oregon law **(Exhibit 7)**.

The Panel then bifurcated remaining issues and conducted a 2-day hearing on January 23 and 24, 2012, at which extensive testimony was offered, and written briefing of the parties was considered, on the sole issue of whether OTRN had exercised its right to match. Nearly two months later, the Panel issued a reasoned interim award dated March 21, 2012 ("Interim Award"), concluding that OTRN had properly exercised its right to match the Courtside Term Sheet and that Savage was obligated to perform services to OTRN in accordance with it **(Exhibit 8)**. Arbitrator Nau included a dissent reversing his prior position and noting he would conclude that the contract violated

California's "deHavilland law" and that Savage could "leave his employment" with OTRN at any time **(Exhibit 8)**.

In sharp contrast to the time and attention allowed to the parties and devoted by the Panel to the two earlier proceedings (Savage's deHavilland law motion and the hearing and interim award on Savage's motion on the right to match), the Panel's Interim Award announced an intention to dispose of the numerous and complicated remaining issues within sixty days. In a departure from prior practice in the proceedings, the Panel did not confer with the parties as to whether such a time frame was adequate to allow the parties to present those issues and facts properly **(Exhibit 8)**. The remaining claims and issues were voluminous and far surpassed all issues that had been considered in the arbitration to date.

After the Interim Award, Savage's remaining claims as set forth in Savage's amended demand for arbitration ("Claimants' Amended Demand") can be characterized as follows: (i) breach of the 2002 Agreement through a failure to promote the Show as required by the contract; and (ii) a claim for compensation alleged to be due under the 2002 Agreement (the caption page and the stated causes of action are attached hereto to as **Exhibit 9**). OTRN, on the other hand, still had numerous claims from its Restated Demands for Arbitration that had yet to be adjudicated,

which included the following:  (i) declaratory relief as to the terms and conditions governing the relationship of the parties given the Match Agreement and the failure and  refusal of Savage to work with OTRN to adopt additional terms required by the Match Agreement; (ii) specific performance of the contract, including Savage's services as required thereunder; (iii) breach of the implied covenant of good faith and fair dealing and bad faith denial of contract; (iv) breach of the 2002 Agreement in various ways, including on-air statements, failing to perform the Show consistently, and failure to perform advertising reads and other duties as required; (v) breach of the confidentiality provision of the 2002 Agreement by filing suit in federal court rather than proceeding as required by the parties' arbitration clause; (vi) copyright infringement; and (vii) breach of the Match Agreement including failure to cooperate in generating online video streaming and the substantial profits therefrom (the caption page and the stated causes of action are attached hereto as **Exhibit 10)**.  OTRN provides this specific listing to demonstrate the egregious failing of the Panel in refusing to discuss any of OTRN's claims in the Final Award other than a footnote regarding its copyright claim and the egregious impropriety in basing the award to Savage on an issue not raised by Claimants' Amended Demand.

## III.   EVIDENCE AND FACTS SUPPORTING RELIEF

### A. The Evidentiary Record

The May 29, 2012 amended scheduling order required all testimony for the final hearing be submitted by declaration, including rebuttal declarations **(Exhibit 4)**. Savage submitted *no* rebuttal declarations to 17 key OTRN declarations (and failed to comply with the Panel's requirements for a belated, and misguided, response to two OTRN declarations of lesser significance). At the hearing on August 13, 2012, Savage *declined* to cross-examine any of OTRN's 20 witnesses.

Thus, OTRN's affirmative testimony at the final hearing was uncontested. In contrast, OTRN submitted rebuttal declarations, and cross-examined Dr. Savage – the sole significant witness providing witness testimony for Savage. Yet, rather than address the specifics of the multiple claims and extensive uncontradicted testimony of OTRN witnesses, the Panel simply dismissed all of OTRN's evidence out of hand. The Panel's refusal to discuss OTRN's 22 evidentiary declarations, most of the content of which is unassailably admissible under federal and Oregon rules of evidence, is unconscionable. To the extent the Panel had supportable objections or issues with the testimony, it was obligated to provide *reasoning* in its Final Award.

OTRN is separately seeking authority from this Court to file the full arbitration record under seal and is only attaching redacted, excerpted copies of key documents to this motion. However, it is helpful to discuss some of those declarations at this stage to illustrate the Panel's failings in this regard.

The 26-page initial declaration of OTRN executive William Crawford, set forth substantial evidence supporting many of OTRN's claims. In particular, it identified $803,890 in immediate advertiser cancellation losses due to the issues in dispute as to Savage (an amount that alone exceeded the amount to which OTRN exercised its rights of setoff or recoupment). It also specifically quantified an additional $12,110,148 in lost revenues from the failures of the advertisers issuing these cancellations to continue their prior existing practice of ongoing contract renewals – citing the specific spending histories of those advertisers which those specific quantifications were based upon. This evidence was unrefuted.

OTRN's declarations also demonstrated Dr. Savage's abuse of production staff and other intimidation tactics to coerce production personnel for the Show to not "dump" his improper statements before they went live on the airwaves. For example, the Declaration of Marcelo Corona **(Exhibit 11),** who began as a

board operator for the Show and was elevated to Director of Operations for OTRN's broadcasting facility, establishes that Dr. Savage threatened to sue Mr. Corona personally for not following Dr. Savage's demands and personally abused him by calling him a "wetback", an "illegal alien", "uneducated", a "****sucker", and a "mother****er".

Other production personnel declarations demonstrated similar actions of intimidation, including one staff member who was consistently referred to by Dr. Savage as "the little faggot" after dumping a derogatory comment by Dr. Savage about the homosexual community. This same staff person witnessed Dr. Savage refuse to work for several days following that incident and knew that Dr. Savage had informed persons that he would not return to work if "the little faggot" was in the studio **(Exhibit 12)**. Further, the witness established that Dr. Savage purported to kick this staff member off the Show twice for dumping his remarks, refused to go on the air if he was working, threatened to sue him personally, and frequently screamed epitaphs such as "mother****er", "****ing amateur", "idiot" and "****ing child" at him.

Other production personnel submitted declarations on behalf of OTRN regarding similar examples of intimidation and abuse by Dr. Savage to preclude use of the dump button to prevent

questionable comments from being aired, as well as recounting various performance or non-performance issues giving rise to OTRN claims against Savage **(Exhibits 13-16)**. One such declaration describes how Dr. Savage coerced a former executive producer of the Show to show up in the studio for the Show despite Dr. Savage being advised that the absence was because he was at the hospital where his son had just been born as a "blue baby" and was in an Intensive Care facility with a collapsed lung **(Exhibit 16)**. It also recounts witnessing how another executive producer was purportedly "fired" from the Show by Dr. Savage for dumping a remark about liberal Jews that "You might as well throw a bagel in a box car" and other similar incidents **(Exhibit 16)**.

The record contains evidence of the denial of valuable video streaming rights by Savage through refusals to cooperate in the installation of the necessary equipment to allow video streaming of the Show (including **Exhibit 11** and admissions by Dr. Savage on cross examination as reflected in the record). Additional OTRN declarations established the substantial monetary value of video streaming a show with an audience size equivalent to the Show. OTRN's unrefuted evidence showed a clear failure by Savage to perform under the Match Agreement (on this and other points) and the resulting damages, which also

were far in excess of the amounts subject to OTRN's exercise of its rights to setoff or recoupment.

B. **Evidence Regarding Conduct of the Proceedings: Threats, Intimidation and Ex Parte Communications.**

Just prior to the filing of the substantial witness declarations due on July 23, 2012, Savage embarked on a campaign of intimidation of the Panel and the AAA. Savage cudgeled and intimidated the AAA and the Panel in a series of *ex parte* e-mails prior to the Final Award. Copies of some of these e-mails were later disclosed to OTRN, but OTRN believes in good faith that additional ex parte communications exist that have not been disclosed and which also prejudiced OTRN's rights to a fair hearing. Indeed, OTRN believes there is evidence of even more outrageous, surreptitious conduct and requests that, if this Court cannot immediately vacate the award on the record here, this Court enter a scheduling order for evidentiary hearings following discovery pursuant to OTRN's separate motion for leave to conduct discovery.

On May 23, 2012, the AAA case administrator sent an e-mail to counsel and the arbitrators indicating that counsel for Savage had telephoned her to discuss the status of issues he had raised by a letter he previously sent on May 15, 2012, and ending with a request to "Please advise." **(Exhibit 17)**. Thus

would begin a series of ex parte contacts by Dr. Savage and his counsel with the AAA, as to which only a portion are expressly addressed herein due to page limitations.

On July 20, 2012, just 3 days before the initial direct testimony witness declarations were due, Dr. Savage e-mailed the AAA case administrator the following.

> "I AM A MEMBER OF THE MAJOR MEDIA . . . I RELIED ON ARBITRATION TO BE LESS COSTLY AND QUICKER THAT THE COURTS. IT IS NOW 19 MONTHS LATER AND $800,000 LATER AND I AM TIED UP IN THIS ENDLESS MESS. WHY? . . . IS THIS THE JUSTICE AAA WANTS PUBLICIZED? THIS IS NOT SUPPOSED TO BE A STAR CHAMBER. I AM ASKING YOU TO TAKE THE CONTENTS OF THIS EMAIL TO THE HEAD OFFICE OF THE AAA. OR I WILL. AND I WILL TAKE IT TO THE PUBLIC AND ASK MY MILLIONS OF LISTENERS AND READERS TO CALL AND WRITE IN WITH THEIR 'ARBITRATION HORROR STORIES.' ps. NBC IS COMING OUT TO FILM AND INTERVIEW ME IN EARLY AUGUST. MICHAEL WEINER AKA MICHAEL SAVAGE"

**(Exhibit 18)**

Dr. Savage's threat was to leverage his enormous radio audience in an onslaught of bad publicity against the AAA. Dr. Savage described the public-relations nightmare awaiting the AAA if it failed to meet his demand for immediate action against OTRN in the arbitration. These bare-knuckle threats were contained in *ex parte* communications.

On July 21, 2012, at 12:51 p.m., Dr. Savage e-mailed the AAA Case Manager demanding "AN EMERGENCY MEETING WITH AAA" **(Exhibit 19)**.

In a brazen *ex parte* e-mail sent by Dr. Savage to the AAA administrator on July 22, 2012, at 8:02 a.m., he demanded specifically that OTRN's copyright claims be dismissed **(Exhibit 20)**.

An e-mail time-stamped July 22, 2012, 9:00 a.m., indicates that Dr. Savage arranged a meeting with "AAA managers" on the following Monday or Tuesday **(Exhibit 21)**. No notice or opportunity to attend such a meeting was given to OTRN nor were any details or information about such meeting ever disclosed to OTRN.

In another *ex parte* e-mail sent July 22, 2012, at 12:24 p.m., to AAA's New York office, and forwarded by Dr. Savage to the Administrator July 23, 2012, at 7:57 a.m., Dr. Savage wrote the following.

> "Subj: MR. KESSLER; I AM MICHAEL SAVAGE, THE NATIONAL RADIO HOST. I HAVE BEEN ENMESHED
>
> IN UNLIMITED LITIGATION OWING TO NUMEROUS PROCEURAL IRREGULARITIES IN MY CASE IN SAN FRANCISCO BEFORE THE AAA . . . I AM ASKING THE BOARD TO STEP IN AND TAKE THE CASE AWAY FROM THIS GROUP OF ARBITRATORS WHO HAVE IGNORED CALIFORNIA AND FEDERAL LAWS, INCLUDING PERMITTING ILLEGALLY OBTAINED WIRETAPS TO BE ADMITTED AS EVIDENCE, WHEN IT HAS NOTHING TO DO WITH THE CASE . . . I WANT IMMEDIATE JUSTICE. IF I AM IGNORED OR TOLD TO 'WAIT FOR THE ARBITRATORS TO DECIDE' I WILL GO PUBLIC. I WILL RUN MANY SHOWS ON MY RADIO PROGRAMS (8-10 MILLION WEEKLY LISTENERS) AND ON MY WEBSITE (4.1 MILLION UNQUES/MONTH). I WILL ASK READERS AND LISTENERS TO SEND ME THEIR 'AAA HORROR STORIES.' THEN I WILL PUBLISH THESE IN A BOOK. I DEMAND JUSTICE[.]"

**(Exhibit 22).**

In yet another *ex parte* e-mail sent to the AAA administrator on July 22, 2012, at 4:15 p.m., Dr. Savage demanded that one of the arbitrators withdraw from the case **(Exhibit 23).**

After the post-hearing briefing was concluded, Dr. Savage sent another e-mail to the AAA on September 13, 2012 demanding the arbitrators make this an "immediate priority" and stating, in part: "I AM ASTOUNDED THAT AFTER ALMOST TWO YEARS AND OVER $900,000 IN LEGAL AND OTHER FEES RELATED TO THE AAA ARBITRATION I STILL DO NOT HAVE A RULING!  I HAVE ASKED POLITELY YET ALL I GET IS A BUREACRATIC NITEMARE [sic] THAT WILL NOT END." **(Exhibit 24).**

Finally, Savage's *ex parte* contacts were not limited to AAA personnel.  In an e-mail dated June 1, 2012, from Savage's counsel to the Panel, the subject line included the phrase "Per Arbitrator Nau's Instruction[.]" **(Exhibit 25),** which indicates that an undisclosed *ex parte* contact occurred with Panel Member Nau.  The e-mail related to a proposed subpoena submitted to the Panel by Savage.  This clearly evidences that Savage or his counsel was in communication with Arbitrator Nau and receiving some level of instruction regarding the case and procedure. This undisclosed *ex parte* communication to the very arbitrator

who filed a written dissent indicating he changed his position of the governing law issues in the Interim Award is obviously prejudicial, if not clearly nefarious.

## C. **Evidence Regarding Arbitrators' Misconduct: Consideration of Issues Outside Scope of Pleadings and Orders**

The May 29, 2012 amended scheduling order, which expressly provided that an earlier scheduling order was to continue in effect except as amended (*see* **Exhibits 3 and 4**), governed the final hearing on the remaining issues to be decided – essentially, all of the claims and issues in the parties' arbitration demands except those matters previously decided by the Panel (whether OTRN had matched and whether California law applied to invalidate the 2002 Agreement). Paragraph 7 of the order states, in relevant part:

> "The issues remaining to be adjudicated which will be the subject of the hearing are all issues not previously adjudicated as set forth in Claimants' Amended Demand for Arbitration dated May 16, 2011; Respondent's Counterclaim Dated June 10, 2011; and the answering statements applicable to said Amended Demand for Arbitration and Counterclaim."

**(Exhibit 4).**

Although the order then summarized the totality of the claims in those pleadings in a single sentence, it did not change the standing order (or the express words of the foregoing sentence) that it was those pleadings that were the sole source of all

issues and claims before the Panel. The Panel was not entitled to award relief to Savage that was not based on a claim asserted in Claimants' Amended Demand, and, as a result, as to which OTRN was not on notice as to what would be addressed by the Panel **(See Exhibit 9)**.

Savage did not make any claim in Claimants' Amended Demand for Arbitration that OTRN breached the Match Agreement by exercising its rights of setoff or recoupment with respect to any payments due thereunder, nor did Savage seek termination of the Match Agreement *on that basis* **(See Exhibit 9)**. As a result, the Panel should not have considered the claim, much less awarded relief based on it, particularly relief that the Panel was not permitted to award under the parties' arbitration agreement. It was grossly improper for the Panel to cavalierly dismiss the extensive admissible evidence and numerous issues properly before it, which required reasoned responses, and instead issue a ruling based solely on a matter which was not properly before it.

Furthermore, the various scheduling orders in the arbitration noted that the parties had stipulated to arbitration of the claims raised in their respective arbitration demands. OTRN never stipulated to arbitration of any claims not contained in the arbitration demands expressly referenced in the

scheduling orders. Nor did OTRN ever agree that termination was an appropriate remedy for any claims in the arbitration. An earlier scheduling order in the case specified that the governing arbitration clause was the one contained in the 2002 Agreement. (**Exhibit 3**- August 8, 2011 scheduling order). That clause prohibits termination as a remedy where there is a dispute as to performance to be resolved in the arbitration. Thus, even if OTRN's exercise of its rights of setoff or recoupment were properly before the Panel, a point OTRN does *not* concede as noted above, the Panel did not have authority to terminate the parties' contractual relationship. Once it determined that OTRN owed a sum certain, it was limited to ordering such amount be paid in cash as explained further below.

Judge Illston's orders noted that Oregon law be applied to this arbitration, a point the Panel acknowledged in its earliest scheduling order. Nonetheless, the Panel then permitted Savage to bring a motion for judgment on the pleadings based on California law and, after issuing an interim order denying the motion in September, allowed the issue to be revisited at the January 2012 hearings on the right to match issue, finally resolving the issue against Savage in the Interim Award. Having taken seven and one half months from the initial scheduling order in the case on August 8, 2011 to the time of the Interim

Award on March 21, 2012, it was improper for the Panel to then state in the Final Award "the intent of the panel to conclude the hearing" on all other issues and claims (which constituted far more in amount and complexity than what had been resolved to that date) within 60 days, particularly without seeking or receiving any input from OTRN as to the scope and complexity of the remaining issues, or the time required for the hearing itself or the preparation for the hearing **(Exhibit 5)**. By this action, the Panel clearly indicated that it did not intend to give the remaining matters the time and attention they required.

D. **Evidence Regarding Arbitrators' Misconduct: Imperfectly Executed Award and Improper Unauthorized Relief**

The tone of the Final Award is quite different from the Panel's earlier rulings and reveals a panel that had given in to the repeated pressures, bullying, fear tactics, and threats of Savage and his counsel and whatever else may be established as a result of discovery.

The Final Award does not attempt to outline, or even specifically address, the specific claims of the parties, stating that they are "numerous, and in many cases not clearly articulated, so that it would be impossible to list each of them here." **(Exhibit 5)**. The Final Award then addresses the evidence, which OTRN counsel and OTRN personnel spent thousands

of hours preparing, and which was not contradicted by Savage, as follows:

> "The declarations offered by both sides were lengthy and the evidence voluminous. However, with very few exceptions, the testimony was unpersuasive, lacking in credibility, self-serving, lacking in foundation, highly speculative, unreliable hearsay, and not the least bit probative of the elements of any claim arising under contract, tort, or statute."

**(Exhibit 5).**

This statement is disingenuous since, at the hearing, objections by OTRN to proposed evidence by Savage, based on such grounds, were overruled at the prior interim hearing in January 2012, and the Panel went to some pains explaining that rules of evidence would be relaxed since they did not sit in a court of law. The Panel Chair noted that the written testimony contained "considerable hearsay" and that much of it lacked foundation. He stated the following.

> "And those are just examples of testimony that might be objectionable and that I would dare say if we were in a court, and particularly with a jury, would not be admitted."

> "All of that said, the panel here are all experienced. As I know we discussed when we were here the last time, arbitration is not a trial. I believe that this panel is more than capable of separating the wheat from the chaff and, accordingly, all pending Motions in Limine are denied."

> (**Exhibit 26,** caption and page 6 of the transcript of the August 13, 2012 hearing – lines 7-20).

However, there is absolutely no explanation or reasoning in the award as to any specific evidence, and certainly nothing to show that the Panel did, in fact, separate the wheat from the chaff, rather than simply citing the presence of some chaff as an excuse to refrain from considering and evaluating any evidence. As noted above, whether or not some "chaff" existed, OTRN presented considerable "wheat" which the Panel dismissed without discussion.

Incredibly, the Panel simply ignored evidence, including admissions by Savage that Savage had failed to perform with respect to the video streaming component of the Match Agreement and the evidence relating to the monetary value of that component. Yet the *Panel* somehow was able to go beyond the pleadings to find a basis to award compensation to Savage for an amount which OTRN had exercised its right of setoff on and to declare the agreement of the parties terminated as a result despite the lack of any claim for such relief being properly before it **(Exhibit 5, Exhibit 4, Exhibit 9)**.

As noted, the Panel went beyond what was in its power to award. The arbitration clause in the 2002 contract **(Exhibit 6)** allowed the arbitrators to interpret the meaning of the agreement. The Panel did not have the authority to declare a material breach and order the contract terminated immediately.

Even assuming that there had been a *reasoned* basis for determining that the payment at issue had to be made in the form of cash and further still that a claim based on OTRN's election to use setoff or recoupment as a substitute performance was within the claims made in Savage's Amended Demand, the Panel's authority under the arbitration clause did not authorize immediate contract termination. Rather, the Panel was to determine the required performance and then OTRN should have been allowed the option to perform (making payment via cash) if a breach was found.

## IV.   APPLICABLE LEGAL PRINCIPLES AND ANALYSIS

The Panel's egregious misconduct and disregard of its obligations under the law meet the standard required for vacatur under the FAA. Section 10 of the FAA provides, in pertinent part, that an award may be vacated:

> "(1) where the award was procured by corruption, fraud, or undue means;
> (2) where there was evident partiality or corruption in the arbitrators, or either
> of them;
> (3) . . . or of any other misbehavior by which the rights of any party have been
> prejudiced; or
> (4) where the arbitrators exceeded their powers[.]"

(9 U.S.C. §10).

The Ninth Circuit has recognized the ongoing viability of the "manifest disregard of the law" ground based on its conclusion that the principle is embodied in paragraph (4) of section 10.

*Comedy Club Inc. v. Improv West Assoc.*, 553 F.3d 1277, 1290 (9th Cir. 2009), *cert. denied*, 130 S. Ct. 145, 175 L. Ed. 2d 36 (2009) (vacating, in part, arbitration award where arbitrators ignored relevant California law regarding covenants not to compete). The evidence discussed above and shown in the voluminous arbitration record and excerpted record submitted to this Court herewith, and which OTRN is prepared to expressly delineate in evidentiary hearings as necessary, demonstrates that the Panel was corrupted and unduly influenced by Savage to such an extreme degree that the award rendered is wholly unsupportable and irrational.

A. **Award was procured by corruption, fraud, or undue means.**

The award must be vacated, pursuant to 9 U.S.C. §10(a)(1), because it was procured by corruption, fraud, or undue means. Vacatur for "undue means" requires behavior that is immoral, if not illegal. *A.G. Edwards & Sons, Inc. v. McCollough*, 967 F.2d 1401. 1403 (9th Cir. 1992). A nexus must exist between the fraud and the basis for the award. *Forsythe International, S.A. v. Gibbs Oil Co. of Texas*, 915 F.2d 1017, 1022 (5th Cir. 1990); see also *McCollough,* 967 F.2d at 1404 (holding that the same test for fraud applies to "undue means" under 9 U.S.C. §10(a)(1).

The threats and intimidation contained in the *ex parte* communications reflect Savage's immoral motive to deny OTRN a

fair hearing. As set forth above, Dr. Weiner recited his position as a member of the "major media" and threatened to "go public" with AAA horror stories, demanded a meeting with AAA managers that apparently took place, e-mailed about a specific claim (copyright infringement), and sent an e-mail pressing for a ruling a mere 3 days after he had submitted his closing brief to the Panel. His counsel threatened to have the Panel and AAA removed if the case was delayed.

AAA is engaged in a competitive business and must maintain its market position. It depends heavily on its good will and public image since its services are effected largely by parties referring to the AAA in their private arbitration contracts. Therefore, as Savage recognized, the AAA is particularly susceptible to bad publicity. And, of course, Panel members are susceptible to pressure from the AAA since they are subject to removal from the AAA's roster of available arbitrators at the AAA's discretion.

Savage's threats and the corruption of this process detracts from the strong federal policy favoring arbitration proceedings, as shown in the FAA and numerous US Supreme Court cases, by damaging the integrity of the process. The *ex parte* communications, which materially related to issues in the arbitration, are themselves clear and convincing evidence of

"fraud" and "undue means." There is a direct nexus between them and the relief ultimately afforded Savage in the award. Accordingly, vacatur is warranted under 9 U.S.C. §10(a)(1).

B. **Evident partiality or corruption by the Panel.**

Evident partiality can be established by specific facts indicating improper motives. *See Woods v. Saturn Distrib. Corp.*, 78 F.3d 424, 427 (9th Cir.), *cert. dismissed*, 117 S. Ct. 30, 135 L. Ed. 2d 1123 (1996) (discussing difference in actual bias versus nondisclosure cases under section 10(a)(2)). Indeed, if an arbitrator's personal stake in the outcome is outrageous, it may create a risk "so inconsistent with principles of justice that the arbitration award must be automatically vacated." *Id.* at 429 (quoting *Pitta v. Hotel Association of New York City*, 806 F.2d 419, 423-424 (2nd Cir. 1986)).

The *ex parte* communications and the nature of the final award in the context of the entire proceeding create a reasonable impression of bias on the part of the Panel and support vacatur under 9 U.S.C. § 10(a)(2). As noted, it appears Savage and his counsel had instruction from Arbitrator Nau, who authored a dissent months earlier and would have held Savage released from his contract with OTRN. The award itself is further evidence. The Panel does not even attempt to explain

itself or to provide a reasoned award addressing the specifics of the issues and the evidence. It doesn't address any of OTRN's claims. The ex parte contacts of Savage with the Panel and AAA resulted in bias against OTRN and rise to a level of "evident partiality" justifying vacatur. Further, OTRN, by its separate motion, is seeking leave to conduct discovery to fully document the full scope of the improper dealings and contacts at issue.

### C. <u>Misconduct on the part of the Panel.</u>

Vacatur is appropriate where an arbitrator's misbehavior, including for example his or her evidentiary rulings, is prejudicial, meaning that the affected party was deprived of a fair hearing. *See U.S. Life Ins. Co. v. Superior Nat'l Ins. Co.,* 591 F.3d 1167, 1173-1177 (9th Cir. 2010) (discussing prejudicial misconduct ground in section 10(a)(3) of the FAA); *see also Hoteles Condado Beach v. Union De Tronquistas Local 901,* 763 F.2d 34, 40 (1st Cir. 1985). This is in keeping with the goal of section 10's limited grounds "to preserve due process but not to permit unnecessary public intrusion into private arbitration procedures." *Kyocera Corp. v. Prudential-Bache Trade SErvs., Inc.,* 341 F.3d 987, 998 (9th Cir. 2003) (en banc). Here, the Panel's refusal to consider the evidence submitted in OTRN's direct case, in contravention of its own statements in the

hearing record and rulings on motions *in limine*, deprived OTRN of a fair hearing.

After consistently deferring ruling on evidentiary issues until the hearing, the Panel indicated at the hearing that it was denying all motions in limine because it was an experienced group that could "separate the wheat from the chaff." Yet, other than the briefest footnote to the detailed OTRN declaration of William Crawford (referenced above) that Savage failed to cross-examine or refute with rebuttal evidence, the Final Award contains no discussion of OTRN's voluminous evidence and extensive briefing of the issues in the case.

The fact that AAA returned over one-third of the funds deposited by the parties for time to be spent by the arbitrators unused reflects the failure of the Panel to spend the time necessary to review, consider and analyze the evidence and legal issues. This refund, as well as the noticeable lack of reasoned discussion in the Final Award, is indicative that the Panel failed to review OTRN's evidence, and thus deprived OTRN of a fair hearing. Further, as noted above, the fact that the Panel stated in the Interim Award that it intended to resolve all of the numerous remaining issues within 60 days, and without any prior input from OTRN, demonstrates the Panel's intent to deny OTRN a fair hearing by failing to allow the parties to fully

present the remaining issues to be resolved and by failing to devote the necessary time and attention to the numerous and substantial issues in the arbitration.

Finally, it was misbehavior to award immediate termination of the contract when termination was not an authorized remedy, there was no claim before the Panel placing termination (or even breach) for OTRN's exercise of its setoff or recoupment rights, as to one payment under the Match Agreement, in issue, and OTRN was not afforded an opportunity to object to that as an available remedy. Termination on the specific grounds cited by the Panel was not before the Panel under the applicable scheduling orders **(Exhibits 3 and 4)**. Indeed, the governing arbitration clause in the 2002 contract expressly prohibits termination as a remedy under these circumstances **(Exhibit 6)**. OTRN has been prejudiced both by the Panel's award of improper relief and by being denied a fair chance to address an issue that was not properly before the Panel in this arbitration.

Based on the misconduct set forth in this section and also detailed in the evidence sections above, vacatur is warranted under 9 U.S.C. § 10(a)(3).

D. **The Panel exceeded its powers.**

Under 9 U.S.C. § 10(a)(4), "arbitrators exceed their powers when they express a 'manifest disregard for the law,' or when

they issue an award that is 'completely irrational." *Comedy Club Inc.,* 553 F.3d at 1290.  Here, the Panel has clearly done both.

The scheduling orders clearly identified the scope of the arbitration provision that the Panel was operating under and the claims to be considered at the hearing.  By improperly ordering termination as a remedy and going beyond the designated claims, the Panel clearly exceeded its power.

**(i)  Manifest Disregard**

The Panel intentionally ignored OTRN's equitable right to assert setoff or recoupment against compensation owed to Savage given the much larger claim for damages OTRN asserted against Savage in the arbitration, including, in particular, the claim to video streaming rights as provided in the Match Agreement but denied by Savage.  The established common law right of OTRN to assert setoff or recoupment under the circumstances is "well defined, explicit, and clearly applicable." *Collins v. D.R. Horton, Inc.,* 505 F.3d 874, 879-80 (9th Cir. 2007).

Setoff is an equitable defense that is well established in Oregon case law. *See Welsh v. Case*, 180 Or.App. 370, 43 P.3d 445 (2002).  Setoff is a money demand by a defendant against a plaintiff arising upon contract and constituting a debt independent of and unconnected with the cause of action set

forth in the complaint. *Rogue River Management Co. v. Shaw*, 243 Or. 54, 411 P.2d 440 (1966). The Supreme Court has observed that the "right to setoff . . . allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding "the absurdity of making A pay B when B owes A." *Studley v. Boylston National Bank of Boston*, 229 U.S. 523, 528, 33 S. Ct. 806, 57, L. Ed. 1313 (1913).

Recoupment is defined in Oregon caselaw as "keeping back and stopping something which is due." *Krausse v. Greenfield*, 61 Or. 502, 123 P. 392, 394 (1912) ("recoupment could be invoked when the defendant sustained damages by reason of the plaintiff's nonperformance of his part of the contract sued on . . .").

Had the Panel fully and properly considered the evidence and made a reasonable determination, this would justify a determination that the amount subject to OTRN's exercise of its setoff/recoupment rights was required to be paid in cash, *not* an order terminating the contract on that basis. The Panel strayed from a rational interpretation and "application of the agreement and effectively dispense[d] [its] own brand of industrial justice." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l.*, 130 S. Ct. 1758, 1767, 176 L. Ed. 605 (2010).

The applicable law justifying OTRN's exercise of set off and recoupment rights, including certain of the cases cited herein, was expressly called to the attention of the Panel in OTRN's closing brief, at Page 7, line 11, through Page 8, line 18. (The caption page and Pages 7-8 of the OTRN closing brief are set forth as **Exhibit 27** hereto). OTRN addressed these points specifically, from an abundance of caution, given improper references to the exercise of such set off and recoupment rights in the arguments advanced on behalf of Savage at the final hearing. However, responding for the record to such improper arguments does not place the issue before the Panel for the hearing, nor alter the inability of OTRN to address such issue in OTRN's opening brief or evidentiary submissions prior to the hearing. While the record will reflect other communications with the arbitrators concerning Savage's objection to the set off and recoupment by OTRN, and OTRN's differences of opinion on the matter, the Panel did not choose to accept any request on behalf of Savage to address the matter prior to the final hearing, did not place the matter into the final May 29, 2012 Scheduling Order (even though the issue had been raised with the Panel multiple times on behalf of Savage outside of matters duly pending before the Panel), and did not at any time set such issue for briefing, evidence or argument,

either at the hearing or otherwise. As a result, the decision of the Panel to base their Final Order almost entirely on that non-issue for the final hearing, without any prior notice to OTRN whatsoever, is a gross abuse of discretion by the Panel.

Even if the Panel was to have considered OTRN's direct evidence, and still dismissed its monetary claims against Savage, thus negating the setoff or recoupment, the appropriate remedy would be to allow OTRN to cure by payment to Savage, rather than immediate termination, which was not authorized by the underlying contract. For purposes of the arbitration, OTRN's setoff or recoupment was sufficient performance until the conflicting monetary claims were resolved. The Panel's termination of the contract was therefore in manifest disregard of the established law of setoff and recoupment and warrants vacatur.

**(ii) Irrational Award**

As discussed in other sections above, it was completely irrational for the Panel to terminate the parties' contract based on OTRN withholding payments owing to Savage where OTRN properly asserted setoff/recoupment rights based on viable and valid monetary claims against Savage. As noted above, the arbitration clause in the 2002 Agreement expressly prohibited termination as a remedy in disputes involving the meaning of

terms in the contract. The basis for the Savage claims to be considered in the final hearing was clearly identified as Claimants' Amended Demand **(Exhibit 9)**, which did not include the claim on which the Panel purported to award relief in the Final Award **(Exhibit 5)**.

## V. CONCLUSION

For the reasons set forth above, OTRN respectfully requests that this Court vacate the Final Award without the necessity for further proceedings, or, in the alternative, that it enter a scheduling order providing for full evidentiary hearings following the conclusion of such discovery as may be permitted by the Court's ruling on OTRN's Motion for Leave to Take Limited Discovery in Post-Arbitration Proceedings to be filed shortly with the Court.

Dated:    November 1, 2012

STEWART HUMPHERYS MOLIN & GRIFFITH, LLP


By:    _____
       David R. Griffith,
       Attorney for Defendant